IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

* * * * * * * * *

| | |
|---|---|
| THE CINCINNATI INSURANCE COMPANY, an Ohio Corporation,<br><br>          Plaintiff,<br>vs.<br><br>AMSCO Windows, a Utah Corporation; and ARROWOOD INDEMNITY COMPANY, as successor to Royal Indemnity Company and American & Foreign Insurance Company, a Delaware Corporation,<br><br>          Defendants;<br>_____<br><br>AMSCO Windows, a Utah Corporation,<br><br>          Counterclaim Plaintiff,<br>vs.<br><br>THE CINCINNATI INSURANCE COMPANY, an Ohio Corporation,<br><br>          Counterclaim Defendant. | Civil No.  2:10-CV-00542 BSJ<br><br>**MEMORANDUM OPINION & ORDER**<br>**(Fed. R. Civ. P. 56)** |

> **FILED**
> CLERK, U.S. DISTRICT COURT
> February 5, 2013 (2:35pm)
> DISTRICT OF UTAH

* * * * * * * * *

On June 10, 2010, plaintiff Cincinnati Insurance Company ("Cincinnati") commenced

this action seeking a declaratory judgment that Cincinnati has no duty to defend or indemnify

AMSCO under the terms of its commercial general liability insurance policies and commercial

umbrella liability policies with respect to "any claims in the Third Party Complaints filed by J&L

Windows, Inc. ('J&L') and other various claimants . . . against AMSCO, in any and all actions

arising out of or related to construction of homes located in various subdivisions in Nevada,"

including several civil cases pending before the Nevada state district courts.[1]  Further, Cincinnati

"seeks a determination that it owes no duty of equitable contribution or indemnity" to Arrowood

Indemnity Company ("Arrowood") "for defense costs and/or fees paid by it on AMSCO's behalf

as a result of the underlying litigation."[2]  In turn, both AMSCO and Arrowood filed answers and

counterclaims against Cincinnati, seeking "a declaratory judgment finding that Cincinnati is

required to defend and indemnify AMSCO from the Nevada claims and lawsuits and that

Cincinnati is obligated to reimburse AMSCO for its litigation expenses incurred as a result of

---

[1](Complaint for Declaratory Judgment, filed June 10, 2010 (CM/ECF No. 2), at 2 ¶ 1.)
Cincinnati's Complaint invokes this court's diversity jurisdiction, *see* 28 U.S.C. § 1332(a) (2006
ed.), as well as the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202 (2006 ed.), (*id.* at 4 ¶ 6),
but recites that "[t]his action is filed pursuant to the Declaratory Judgment Action Statute,
§78-33-1, Utah Code Ann. (1953, as amended)."  (*Id.* at 2 ¶ 1.)  The Utah declaratory judgment
statute as revised by the Utah Legislature in 2008 and in effect at the time Cincinnati's
Complaint was filed is found at Utah Code Ann. §§ 78B-6-401 through 78B-6-412 (2008).
   Diversity actions seeking declaratory relief in this court are generally footed upon the
federal Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202.  *See* 10 Fed. Proc., L. Ed.
*Declaratory Judgments* § 23:8, at 19-20 (2007) ("Where diversity of citizenship is the
jurisdictional basis of a declaratory judgment action, . . . federal law determines whether a federal
court can and may properly render a declaratory judgment." (footnotes omitted) (citing *Farmers
Alliance Mutual Insurance Co. v. Jones*, 570 F.2d 1384, 1386 (10th Cir.), *cert. denied*, 439 U.S.
826 (1978) (holding that under the *Erie* doctrine, a state declaratory judgment statute is
procedural, not substantive))); *Cincinnati Ins. Co. v. Holbrook*, 867 F.2d 1330, 1332-33 (11th
Cir. 1989) (observing that "invocation of the federal Declaratory Judgment Act, 28 U.S.C. §§
2201, 2202, is neither precluded nor controlled by [state] procedural law"), *abrogated on other
grounds by Wilton v. Seven Falls Co.*, 515 U.S. 277, 289-90 (1995) (holding that "district courts'
decisions about the propriety of hearing declaratory judgment actions, which are necessarily
bound up with their decisions about the propriety of granting declaratory relief, should be
reviewed for abuse of discretion"); *AG Acceptance Corp. v. Veigel*, 564 F.3d 695, 701 (5th Cir.
2009) (holding that state declaratory judgment act is not "'controlling [state] substantive law'" in
a diversity case); *cf. Employers Mut. Cas. Co. v. Bartile Roofs, Inc.*, 618 F.3d 1153, 1156 (10th
Cir. 2010);  *Fischer Imaging Corp. v. General Elec. Co.*, 187 F.3d 1165, 1168-74 (10th Cir.
1999); *Gant v. Grand Lodge of Texas*, 12 F.3d 998, 1001-03 (10th Cir. 1993).

   [2](Complaint at 3 ¶ 1.)

Cincinnati's refusal to extend coverage under its policies,"[3] as well as a declaratory judgment that Cincinnati owes Arrowood "a duty of equitable contribution or indemnity for defense costs and/or fees paid by ARROWOOD on behalf of AMSCO" as a result of the same Nevada claims and lawsuits.[4]

> The Declaratory Judgment Act reads in pertinent part:

> In a case of actual controversy within its jurisdiction . . ., any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought.

28 U.S.C. § 2201(a) (2012 ed.).  The Declaratory Judgment Act does not provide an independent basis for jurisdiction. Rather, it provides courts with discretion to fashion a remedy in cases where federal jurisdiction already exists.  *Heydon v. MediaOne of Southeast Mich., Inc.*, 327 F.3d 466, 470 (6th Cir. 2003).  In this case, the subject matter jurisdiction to hear Cincinnati's declaratory judgment action properly arises out of diversity jurisdiction pursuant to 28 U.S.C. § 1332(a), and there exists "a substantial controversy between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Md. Cas. Co. v. Pac. Coal & Oil Co.*, 312 U.S. 270, 273 (1941).  Accordingly, the Court finds that Cincinnati's claims and the counterclaims of AMSCO and Arrowood present a justiciable controversy under 28 U.S.C. § 2201(a).

---

[3](Answer of AMSCO Windows to the Cincinnati's Insurance Company's Complaint; and AMSCO Windows' Counterclaim For Declaratory Relief, filed August 13, 2010 (CM/ECF No. 13), at 10 ¶ 15.)

[4](Answer of Arrowood Indemnity Company to the Cincinnati's Insurance Company's Complaint and Counterclaim for Declaratory Relief, filed July 14, 2010 (CM/ECF No. 6), at 14 ¶ 7.)

"In a diversity action," including one seeking declaratory relief, "we apply the substantive law of the forum state, including its choice of law rules." *Pepsi-Cola Bottling Co. of Pittsburg, Inc. v. PepsiCo, Inc.*, 431 F.3d 1241, 1255 (10th Cir. 2005) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 495-97 (1941)); *Stickley v. State Farm Mut. Auto. Ins. Co.*, 505 F.3d 1070, 1076 (10th Cir. 2007).  Indeed,

> In cases arising under diversity jurisdiction, the federal court's task is not to reach its own judgment regarding the substance of the common law, but simply to "'ascertain and apply the state law.'" *Wankier v. Crown Equip. Corp.*, 353 F.3d 862, 866 (10th Cir. 2003) (quoting *Huddleston v. Dwyer*, 322 U.S. 232, 236, 64 S. Ct. 1015, 88 L. Ed. 1246 (1944)); *see also Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78, 58 S. Ct. 817, 82 L. Ed. 1188 (1938).  The federal court must follow the most recent decisions of the state's highest court.  *Wankier*, 353 F.3d at 866. "Where no controlling state decision exists, the federal court must attempt to predict what the state's highest court would do."  *Id.*  In doing so, it may seek guidance from decisions rendered by lower courts in the relevant state, *Progressive Cas. Ins. Co. v. Engemann*, 268 F.3d 985, 988 (10th Cir. 2001), appellate decisions in other states with similar legal principles, *United States v. DeGasso*, 369 F.3d 1139, 1148 (10th Cir. 2004), district court decisions interpreting the law of the state in question, *Sapone v. Grand Targhee, Inc.*, 308 F.3d 1096, 1100, 1104–05 (10th Cir. 2002), and "the general weight and trend of authority" in the relevant area of law, *MidAmerica Constr. Mgmt., Inc. v. MasTec N. Am., Inc.*, 436 F.3d 1257, 1262 (10th Cir. 2006) (internal quotation marks omitted).  Ultimately, however, the Court's task is to predict what the state supreme court would do.

*Wade v. EMCASCO Ins. Co.*, 483 F.3d 657, 665-66 (10th Cir. 2007).

**FACTUAL BACKGROUND**

Since 1949, AMSCO has manufactured and sold windows for use in homes.  AMSCO sells its products through wholesale distributors and dealers, including J&L Windows, Inc. ("J&L"), which purchased windows from AMSCO and resold them.  AMSCO does not install its window products in residential structures; nor does it hire its own contractors or subcontractors to do so.  The AMSCO windows at issue in this case were sold through J&L and were ultimately

installed in new homes constructed in the State of Nevada.  A number of homeowners have since asserted claims against the contractors who built their homes, alleging numerous construction defects in their homes, including the windows, and that those defects caused property damage to their homes.  (AMSCO refers to these claims collectively as the "Homeowner Claims").   The contractors, in turn, asserted claims against J&L and others, who then asserted third-party claims against AMSCO.

Some of the Homeowner Claims have ripened into civil litigation in the Nevada State courts.  Others have been asserted pursuant to "Chapter 40," a specific Nevada statute governing construction defect claims.  *See* Nev. Rev. Stat. §§ 40.600 to 40.635.  Prior to filing a civil complaint, Chapter 40 requires a homeowner to file a Notice of Compliance, setting forth in reasonable detail the defects in the home and the known nature and extent of the damages caused by such defects, and providing the contractor the opportunity to inspect the residence and repair any damages found.  *See* Nev. Rev. Stat. § 40.645.[5]  Pursuant to Chapter 40, a contractor must also forward the notice to each subcontractor and/or supplier "whom the contractor reasonably believes is responsible for a defect specified in the notice."  Nev. Rev. Stat. § 40.646.  AMSCO

_____

[5]The Nevada Supreme Court has held that a construction defect claimant must fully comply with Chapter 40 before initiating a constructional defect action.  *See, e.g.*, *D.R. Horton, Inc. v. Eighth Judicial District ex rel. County of Clark*, 168 P.3d 731, 737 (Nev. 2007) ("A claimant's failure to comply with [Chapter 40] requirements before filing a constructional defect action results in the dismissal or postponement of that action until claimant complies with those requirements.").  The Nevada Legislature "intended to provide contractors with an opportunity to repair constructional defects in order to avoid litigation," *id.*, and the mandatory language chosen by the legislature in the statute confirms this interpretation.  *See* Nev. Rev. Stat § 40.647 ("If a claimant commences an action without" meeting Chapter 40's procedural requirements, the "the court shall dismiss the action.").

received Chapter 40 notices for each of the Homeowner Claims at issue in this case.

AMSCO had purchased comprehensive general liability ("CGL") policies from the predecessor of Arrowood Indemnity Company/Arrowpoint Capital ("Arrowood") for the period of time from 1998 to 2002; from Cincinnati for the period from 2002 to 2007; and from the predecessor of Chartis for the period of 2007 to 2009.[6]  Based upon its receipt of the Chapter 40 notices and/or service of process in the Nevada civil litigation, AMSCO tendered its defense of the Homeowner Claims to the three insurers.  Arrowood and Chartis assumed their obligation to defend AMSCO in several cases, but Cincinnati declined to do so, instead filing this declaratory judgment proceeding to absolve itself of any duty to defend or indemnify AMSCO with reference to the Homeowner Claims.

The specific Homeowner Claims which Cincinnati has refused to defend are summarized in the parties' summary judgment memoranda[7] and will not be detailed herein.
In each instance, the claimants allege the existence of window-related defects, namely, that windows made by AMSCO were defective and/or defectively installed, and that the window defects caused property damage to the interior and/or exterior of the house beyond the window defects themselves—that is, that the faulty workmanship involving AMSCO's windows caused property damage to something other than the insured's work product.

---

[6]The CGL policies issued by each insurer are all derived from the same standard form CGL policy issued by the Insurance Services Office, Inc. ("ISO"), a national insurance industry association.

[7]Cincinnati's Complaint listed ten of AMSCO's Homeowner Claims as to which Cincinnati has refused AMSCO's tender of defense under its policies, along with a catch-all reference to "any and all actions arising out of or related to construction of homes located in various subdivisions in Nevada."  (Complaint at 3 ¶ 1.)

**The Pending Motions**

On June 14, 2011, AMSCO filed a Motion for Summary Judgment or in the

Alternative to Certify a Legal Question to the Utah Supreme Court,[8] asserting that (1)

Cincinnati's duty to defend AMSCO under the terms of its commercial general and umbrella

liability insurance policies must be determined from the allegations set forth in the various third-

party claims against AMSCO, referred to therein as the "Homeowner Claims;" (2) that those

claims allege "occurrences" triggering Cincinnati's duty to defend AMSCO; (3) that there are no

applicable policy exclusions upon which Cincinnati can rely to avoid this duty; and (4) there

exists no genuine dispute of any material fact.  AMSCO seeks an order requiring Cincinnati to

defend AMSCO against the Homeowner Claims and pay all fees AMSCO has incurred defending

against the Homeowner Claims, or alternatively, asks this court to certify to the Utah Supreme

Court "the purely legal question of whether the Homeowner Claims underlying this action

obligate Cincinnati to defend AMSCO under Utah law."[9]

On October 11, 2011, Cincinnati filed a memorandum in opposition to AMSCO's

---

[8](Motion for Summary Judgment or in the Alternative to Certify a Legal Question to the
Utah Supreme Court, filed June 14, 2011 (CM/ECF No. 24).)  Arrowood joined in AMSCO's
motion for summary judgment as well.  (*See* Defendant and Counterclaimant Arrowood
Indemnity Company's Motion for Summary Judgment and Joinder in AMSCO's Motion for
Summary Judgment or in the Alternative to Certify a Legal Question to the Utah Supreme Court,
filed July 7, 2011 (CM/ECF No. 29).)

[9](*Id.* at 2)  According to AMSCO, "The split of authority regarding the scope of an
insurer's duty to defend under an occurrence-based policy, including conflicting opinions from
the Utah Supreme Court and the Federal District Court for the District of Utah, render this matter
appropriate for certification."  (*Id.* at 3.)

motion,[10] together with a cross-motion for summary judgment against AMSCO,[11] asserting that under Utah law, AMSCO's alleged negligence in manufacturing defective windows in Utah that were later sold and installed in homes located in a Nevada does not constitute an "occurrence" within the meaning of Cincinnati's insurance policies; thus "Cincinnati has no duty to defend or indemnify AMSCO under the terms of the insurance contracts for any of the claims asserted in the underlying litigation."[12]

Cincinnati and Arrowood also filed cross-motions for summary judgment on the issue whether Cincinnati owes Arrowwood equitable contribution or indemnity for defense costs paid by Arrowood on behalf of AMSCO in connection with the Nevada claims and litigation.[13]

These summary judgment motions came before the court for hearing on December 5, 2011. At that time, the court heard the arguments of counsel and took the matter under advisement.[14]

---

[10](The Cincinnati Insurance Company's Memorandum in Opposition to AMSCO Windows' Motion for Summary Judgment or in the Alternative to Certify a Legal Question to the Utah Supreme Court, filed October 11, 2011 (CM/ECF No. 50) ("Cincinnati Opp. Mem.").)

[11](The Cincinnati Insurance Company's Motion for Summary Judgment Against AMSCO Windows, filed October 11, 2011 (CM/ECF No. 48).)

[12](*Id.* at 2.)

[13](Defendant and Counterclaimant Arrowood Indemnity Company's Motion for Summary Judgment and Joinder in AMSCO's Motion for Summary Judgment or in the Alternative to Certify a Legal Question to the Utah Supreme Court, filed July 7, 2011 (CM/ECF No. 29); The Cincinnati Insurance Company's Cross-Motion for Summary Judgment on Arrowood Indemnity Company's Counterclaims, filed October 11, 2011 (CM/ECF No. 46).)

[14](*See* Minute Entry, dated December 5, 2011 (CM/ECF No. 59).)

**ANALYSIS**

**Burden of Proof**

In a declaratory judgment action regarding liability insurance coverage, the burden of proof depends in part on the specific issue in dispute. *See Utah Farm Bureau Ins. Co. v. Dairyland Ins. Co.*, 634 F.2d 1326, 1328 (10th Cir. 1980). The burden of establishing coverage under an insurance policy is on the party who asserts that a loss comes within the coverage of the policy, even when the insurer commences a declaratory action to resolve the question. *Id.*; *see also Fireman's Fund Ins. Co. v. Videfreeze*, 540 F.2d 1171, 1174-76 (3d Cir. 1976); *Hartford Accident & Indem. Co. v. Shaw*, 273 F.2d 133, 137 (8th Cir. 1959) (holding that the burden of proving coverage under the omnibus clause of an insurance policy is upon the person seeking coverage); *Reliance Life Ins. Co. v. Burgess*, 112 F.2d 234, 238 (8th Cir. 1940) ("[i]t is a fundamental rule that the burden of proof in its primary sense rests upon the party who, as determined by the pleadings, asserts the affirmative of an issue"); *Barker v. Goldberg*, 705 F. Supp. 102, 104-05 (E.D.N.Y. 1989).

As the Utah Court of Appeals explains in *Young v. Fire Insurance Exchange*, 2008 UT App 114, 182 P.3d 911:

> In *LDS v. Capitol Life Insurance Co.*, 765 P.2d 857 (Utah 1988), the Utah Supreme Court explained that when claiming a right to recovery under an insurance policy, an insured must first bring him or herself within the accident provision in the policy. *See id.* at 859. *LDS* quoted extensively from *Browning v. Equitable Life Assurance Society*, 94 Utah 570, 80 P.2d 348 (1938), where the court explained:
>
> > When an insured claims a right to recover under the accident provisions of the policy, all he need do is bring himself within the field therein defined and show his injury or disability was proximately and predominantly caused through violent, external

-9-

and accidental means. He then has brought himself within the policy, and the terms thereof have been met. He is not required to show there were no latent causes, or other conditions which might have contributed to the result, indirectly or in part. His duty is affirmative; he is not charged with the duty of negativing anything. When he brings himself within the insuring clause he has made ... a prima facie case ... and any exceptions or conditions which would then deny him relief, take him out of the indemnity provisions, render them inoperative as to him, are matters of defense, and the burden thereof rests upon the insurer.

*Id.* at 350–51 (emphasis omitted).  The *LDS* court went on to explain that this theory is couched in the premise that "exclusionary clauses are to be most strictly construed against the insurer. . . .  It must not be forgotten that the purpose of insurance is to insure. . . ."  765 P.2d at 859.

2008 UT App 114, at Par. 28, 182 P.3d at 918-19; *see also Morris v. Farmers Home Mut. Ins. Co.*, 28 Utah 2d 206, 209, 500 P.2d 505, 507 (1972) (stating that insured "has the burden of proving that his loss comes within the coverage stated in the policy"); *Whitlock v. Old Am. Ins. Co.*, 21 Utah 2d 131, 134, 442 P.2d 26, 27 (1968) (where "the company asserts a defense of noncoverage on the ground of an exception stated in the policy, the general rule of insurance law is that this is in the nature of an affirmative defense; and that the company has the burden of proving by a preponderance of the evidence that the loss comes within the exception stated in the policy").

Thus, although Cincinnati initiated this declaratory judgment action, it is AMSCO and Arrowood, as the parties asserting coverage, that have the burden to prove AMSCO's entitlement to coverage under the terms of Cincinnati's policy.  Only if AMSCO and Arrowood  meet their burden of establishing that the loss falls within the scope of the policies' coverage provisions does the burden shift to Cincinnati to prove that the claim is not covered because of an exclusion. *See LDS Hosp., Div. of Intermountain Health Care v. Capitol Life Ins. Co.*, 765 P.2d 857, 859

-10-

(Utah 1988).

### Construction of Policy Language

To begin with, "'[w]e construe insurance contracts by considering their meaning to a person of ordinary intelligence and understanding, . . . in accordance with the usual and natural meaning of the words, and in the light of existing circumstances, including the purpose of the policy.'" *Lopez v. United Auto. Ins. Co.*, 2012 UT 10, ¶ 17, 274 P.3d 897, 902 (quoting *Doctors' Co. v. Drezga,* 2009 UT 60, ¶ 12, 218 P.3d 598, 603).

> "Insurance policies are generally interpreted according to rules of contract interpretation." *Utah Farm Bureau Ins. Co. v. Crook*, 1999 UT 47, ¶ 5, 980 P.2d 685.  Because "an insurance policy is a classic example of an adhesion contract," Utah courts have long held that " 'insurance policies should be construed liberally in favor of the insured and their beneficiaries so as to promote and not defeat the purposes of insurance.'" *United States Fidelity & Guar. Co. v. Sandt*, 854 P.2d 519, 521–22 (Utah 1993) (quoting *Richards v. Standard Acc. Ins. Co.*, 58 Utah 622, 200 P. 1017, 1020 (1921)).  "It follows that ambiguous or uncertain language in an insurance contract that is fairly susceptible to different interpretations should be construed in favor of coverage" and "provisions that limit or exclude coverage should be strictly construed against the insurer." *Id.* at 522–23.  In strictly construing exclusions, we give them effect only when they use "language which clearly and unmistakably communicates to the insured the specific circumstances under which the expected coverage will not be provided." *Crook*, 1999 UT 47, ¶ 5, 980 P.2d 685 (citations and internal quotation marks omitted).

*Fire Ins. Exchange v. Oltmanns*, 2012 UT App. 230, ¶ 6, 285 P.3d 802, 805.[15]  Accordingly, any

---

[15]Where contract language proves to be ambiguous, courts generally "consider extrinsic evidence in an effort to resolve the ambiguity." *Fire Ins. Exchange v. Oltmanns*, 2012 UT App. 230, ¶ 7, 285 P.3d at 805 (citing *Wilburn v. Interstate Electric*, 748 P.2d 582, 584–85 (Utah Ct. App.1988)).  But "there is a different protocol in the case of insurance and surety contracts, where it is seen as appropriate to jump immediately to what is usually viewed as the "last resort," "tie-breaker" rule of interpretation, namely construction against the drafter." *Id.*  "This is due to the probable dearth of relevant extrinsic evidence in these contexts," because insurance contracts "'are ordinarily not preceded by discussion or negotiation of specific terms and, thus, absent meaningful extrinsic evidence as to intent, recourse must be had directly to the maxim that ambiguities should be construed against the drafter.'" *Id.* at ¶ 8 (quoting *Wilburn*, 748 P.2d at

(continued...)

ambiguities in the insuring agreement, or its exclusions, are resolved in favor of the insured.

*Doctors' Co. v. Drezga*, 2009 UT 60 at ¶12, 218 P.3d at 603 (defining ambiguity as a provision

that is "'capable of more than one reasonable interpretation because of uncertain meanings of

terms, missing terms, or other facial deficiencies.'" (quoting *WebBank v. Am. Gen. Annuity Serv.*

*Corp.*, 2002 UT 88, ¶ 20, 54 P.3d 1139 (internal quotation marks omitted))).  "This rule of strict

construction is justified by 'the need to afford the insured the protection he or she endeavored to

secure by paying premiums.'" *Id.* (quoting *Auto Lease Co. v. Cent. Mut. Ins. Co.*, 7 Utah 2d 336,

325 P.2d 264, 266 (1958)).[16]

> Insurance contracts are generally drafted by the insurance companies and
> allow no opportunity for negotiation of the terms by the insured. . . .  In light of
> this fact, and in order to assure that the purpose for which the policy was
> purchased and the premiums were paid is not defeated, we interpret insurance
> policies liberally in favor of the insured. . . .

*Mellor v. Wasatch Crest Mut. Ins. Co.*, 2009 UT 5, ¶ 16, 201 P.3d 1004, 1009 (citations omitted);

*see also U.S. Fidelity and Guar. Co. v. Sandt*, 854 P.2d 519, 521 (Utah 1993) ("Since 1921 this

Court has expressed its commitment to the principle that 'insurance policies should be construed

liberally in favor of the insured and their beneficiaries so as to promote and not defeat the

purposes of insurance.'" (quoting *Richards v. Standard Acc. Ins. Co.*, 58 Utah 622, 200 P. 1017,

---

[15](...continued)
585 n.2).  As noted above, "construction against the insurer is especially appropriate when an
ambiguous term appears in an exclusionary provision because such provisions are 'strictly
construed against the insurer.'" *Id.* (quoting *Sandt*, 854 P.2d at 523).

[16]"Absent a finding of ambiguity, we simply construe the policy according to its plain and
ordinary meaning." *First Am. Title Ins. Co. v. J.B. Ranch, Inc.*, 966 P.2d 834, 837 (Utah 1998).

1020 (1921))).[17]

### The Insurer's Duty to Defend

Under Utah law, as Judge Campbell has explained,

> A duty to defend arises "when the insurer ascertains facts giving rise to potential liability under the insurance policy." *Sharon Steel Corp. v. Aetna Cas. & Sur.*, 931 P.2d 127, 133 (Utah 1997). When the allegations, if proven, show "there is no potential liability [under the policy], then there is no duty to defend." *Deseret Fed. Sav. v. U.S. Fid. & Guar.*, 714 P.2d 1143, 1147 (Utah 1986). Under Utah law, the court must interpret the insurance policy as it would any written contract, under general contract interpretation principles. *Benjamin v. Amica Mut. Ins. Co.*, 140 P.3d 1210, 1213 (Utah 2006). If one claim or allegation triggers the duty to defend, the insurer must defend all claims (that is, covered and non-covered claims), at least until the suit is limited to the non-covered claims. *Id.* at 1216. Finally, and perhaps most important: "'When in doubt, defend.'" *Id.* at 1215 (quoting Appleman on Ins. Law & Practice § 136.2[C] (2d ed.2006)).

*Ohio Cas. Ins. Co. v. Cloud Nine, LLC*, 464 F. Supp. 2d 1161, 1166 (D. Utah 2006), *rev'd on other grounds*, 458 Fed. Appx. 705 (10th Cir. 2012).

AMSCO correctly asserts that under Utah law,[18] it is well-established that "'an insurer's

---

[17]The *Sandt* opinion discusses the construction of insurance policy language in some detail. *See Sandt*, 854 P.2d at 521-23, and cases cited therein.

[18]AMSCO also correctly asserts that Utah law governs the construction of the insurance policies at issue, and that "[b]ecause there is no actual conflict between Utah, Nevada, and Ohio law relevant to this dispute, . . . the court need not engage in a lengthy conflicts of law analysis at the outset." (Memorandum in Support of AMSCO's Motion for Summary Judgment or in the Alternative to Certify a Legal Question to the Utah Supreme Court, filed June 14, 2011 (CM/ECF No. 25) ("AMSCO Mem.") (citing *St. Paul Fire & Marine Ins. v. Commercial Union Assurance*, 606 P.2d 1206, 1208 n. 1 (Utah 1980) (perceiving "no conflict of laws issue which necessitates a decision on choice of law"); *Anapoell v. American Express Bus. Fin. Corp.*, No. 2:07-CV-198-TC, 2007 WL 4270548, at *11 (D. Utah Nov. 30, 2007) ("In Utah, the courts first determine whether a conflict of law exists."); *Littlefield v. Mobil Exploration & Producing, North America, Inc.*, 988 F. Supp. 1403, 1407 (D. Utah 1996) ("The initial step in resolving the choice of law question is to determine whether a conflict exists between the law of the interested states.")). For its part, Cincinnati engages in a conflicts of law analysis that likewise leads it to conclude that Utah law governs. (*See* Cincinnati Mem. at 12-15.)

duty to defend is broader than its duty to indemnify.'" *Fire Ins. Exch. v. Estate of Therkelsen*, 2001 UT 48, ¶ 22, 27 P.3d at 560 (quoting *Sharon Steel Corp. v. Aetna Cas. & Sur. Co.*, 931 P.2d 127, 133 (Utah 1997).   Indeed, "an insurer may have a duty to defend an insured even if . . . the insurer is ultimately not liable to indemnify the insured." *Id.*[19]

   This broad duty to defend is triggered when "the allegations in the underlying complaint . . . if proved, could result in liability under the policy." *Nova Cas. Co. v. Able Const., Inc.*, 1999 UT 69, ¶ 8, 983 P.2d 575, 578 (citing *Sharon Steel Corp. v. Aetna Cas. & Sur. Co.*, 931 P.2d 127, 133 (Utah 1997) (citing *Deseret Fed. Sav. & Loan Ass'n v. United States Fidelity & Guar. Co.*, 714 P.2d 1143, 1146 (Utah 1986))); *Great American Ins. Co. v.Woodside Homes*, 448 F. Supp. 2d 1275, 1278 (D. Utah 2006) ("If the duty to defend attaches to any claim alleged in a complaint, the insurer is obligated to undertake the defense of its insured for all claims raised in the complaint.").   Accordingly, the insurer's duty to defend arises if there is potential, not actual, liability.  *Sharon Steel*, 931 P.2d at 133 (noting the "defense duty arises when the insurer ascertains facts giving rise to potential liability under the insurance policy").   To negate its duty to defend, an insurer must, therefore, do more than point to a potential lack of insurance coverage regarding one of the claims at issue (or a potentially applicable policy exclusion); instead, the insurer must demonstrate that none of the allegations of the underlying claim is potentially covered (or that a policy exclusion conclusively applies to exclude all potential for such coverage).

---

   [19]*Therkelsen* noted that "as '"[t]he duty to defend arises solely under contract,'"' . . . the accuracy of this proposition hinges on the particular contractual terms of the insurance policy defining the scope of the duty to defend and the duty to indemnify."  2001 UT 48, at ¶ 22, 27 P.3d at 560 (quoting *Sharon Steel*, 931 P.2d at at 141 (quoting *Ins. Co. of N. Am. v. Forty–Eight Insulations, Inc.*, 633 F.2d 1212, 1224–25 (6th Cir. 1980))).

When determining whether the insurer has a duty to defend a particular claim of loss, at the outset the court focuses on two documents: the insurance policy and the underlying complaint:

> "An insurer's duty to defend is determined by comparing the language of the insurance policy with the allegations of the complaint." *Fire Ins. Exch. v. Estate of Therkelsen*, 2001 UT 48, ¶ 21, 27 P.3d 555 (internal quotation marks omitted); *see also Nova Cas. Co. v. Able Constr., Inc.*, 1999 UT 69, ¶ 8, 983 P.2d 575; *Sharon Steel v. Aetna Cas. & Sur.*, 931 P.2d 127, 133 (Utah 1997). In *Therkelsen*, we cited to an alternative formulation of this rule: "'The test is whether the complaint alleges a risk within the coverage of the policy.'" 2001 UT 48, ¶ 21 n.3 (quoting *Continental Cas. Co. v. Alexis I. Du Pont Sch. Dist.*, 317 A.2d 101, 103 (Del. 1974)).

*Benjamin v. Amica Mut. Ins. Co.*, 2006 UT 37, ¶ 16, 140 P.3d 1210, 1214.[20]  In *Therkelsen*, the Utah Supreme Court noted that an insurance contract may base the duty to defend on the face of the complaint and its allegations, or on the facts and circumstances underlying the complaint; "whether extrinsic evidence is admissible to determine whether an insurer has a duty to defend an

---

[20]Throughout the United States, "[g]enerally, an insurer's duty to defend is determined by reading the insurance policy along with the allegations of the complaint." 14 Lee R. Russ & Thomas F. Segalla, *Couch on Insurance* § 200:17 (3d ed. 2007).  As the Utah Supreme Court observed in *Therkelsen*:

> We have followed this rule in several cases. *See Nova Cas. Co. v. Able Constr., Inc.*, 1999 UT 69, ¶ 8, 983 P.2d 575 (stating that "'[a]n insurer's duty to defend is determined by reference to the allegations in the underlying complaint'"); *Sharon Steel v. Aetna Cas. & Sur.*, 931 P.2d 127, 133 (Utah 1997) (noting that the duty to defend "is determined by referring to the allegations in the underlying complaint"); *Deseret Fed. Sav. & Loan Ass'n v. United States Fid. & Guar. Co.*, 714 P.2d 1143, 1147 (Utah 1986) (comparing the allegations of the complaint with the terms of the insurance policy); see also *Simmons v. Farmers Ins. Group*, 877 P.2d 1255, 1258 n.3 (Utah Ct. App. 1994) (stating that "[g]enerally, insurers have a duty to defend any complaint alleging facts which, if proven, would render the insurer liable for indemnification of its insured").

2001 UT 48, at ¶ 21, 27 P.3d at 560.

insured turns on the parties' contractual terms." 2001 UT 48, at ¶¶ 22-25, 27 P.3d at 560-61.

> [W]hen the terms of an insurance contract condition the duty to defend upon allegations contained on the face of the complaint, "extrinsic evidence is irrelevant to . . . determin[e] . . . whether a duty to defend exists."  For example, an insurer would have no duty to defend an insured based on a complaint sounding solely in battery when the policy excludes intentional torts from coverage.  Under these circumstances, the "duty-to-defend analysis . . . focus[es] on two documents: the insurance policy and the complaint.  'An insurer's duty to defend is determined by comparing the language of the insurance policy with the allegations of the complaint,'" and extrinsic evidence plays no part in the analysis.

*Equine Assisted Growth and Learning Ass'n v. Carolina Cas. Ins. Co.*, 2011 UT 49, ¶ 10,

266 P.3d 733, 736 (footnotes omitted) (quoting *Therkelsen*, 2001 UT 48, ¶ 25, 27 P.3d at 561

and *Benjamin*, 2006 UT 37, ¶ 16, 140 P.3d at 1214 (quoting *Therkelsen*, 2001 UT 48, ¶ 21)).  As

*Therkelsen* explains, "[i]f the parties make the duty to defend dependent on the *allegations*

against the insured, extrinsic evidence is irrelevant to a determination of whether a duty to defend

exists."  2001 UT 48, ¶ 25, 27 P.3d at 561 (emphasis added).  "Indeed, in such a case it would be

error for the trial court to consider extrinsic evidence, as it is wholly irrelevant to the issue of

whether the insurer has a duty to defend its insured."  *Id.* at ¶ 23 (footnote omitted).[21]

---

[21]

> On the other hand, when policy terms define the scope of the duty to defend in reference to something other than the allegations in the complaint, a court may look beyond the text of the complaint to determine whether the duty has been triggered.  In that situation, an inquiry limited to the face of the policy and the complaint leaves unanswered the question of whether the insurer has a duty to defend. Thus, while the analysis always begins with an examination of the policy language and the complaint, it ends there only if the policy terms when compared with the allegations definitively indicate that there is or is not a duty to defend. Otherwise, the duty-to-defend inquiry requires information that must be presented in the form of extrinsic evidence.

*Equine Assisted*, 2011 UT 49, ¶ 11, 266 P.3d at 736 (footnote omitted) (citing *Therkelsen*, 2001 UT 48, ¶ 25 ("[I]f, for example, the parties make the duty to defend dependent on whether there

(continued...)

The question is whether the Cincinnati policies' duty-to-defend clause "is triggered by the facial language of a complaint or whether the clause is triggered by the actual facts underlying the complaint." *Equine Assisted Growth & Learning Ass'n v. Carolina Cas. Ins. Co.*, 2009 UT App 200, ¶ 25,  216 P.3d 971, 972, *aff'd*, 2011 UT 49, 266 P.3d 733.[22]

> Initially, Cincinatti's CGL policies provided:

> We will pay those sums that the insured becomes legally obligated to pay as damages because of "personal injury" or "property damage" to which this insurance applies. We will have the right and duty to defend any "suit" seeking those damages. We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result.[23]

The policies were amended in October 2003 to read:

> We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit"

---

[21](...continued)
is actually a 'covered claim or suit,' extrinsic evidence would be relevant to a determination of whether a duty to defend exists.")).

[22]In *Equine Assisted*,  the Utah Supreme Court compared "the relevant policy provisions with the complaint to determine whether the contract conditions the duty to defend solely in reference to the complaint." *Equine Assisted*, 2011 UT 49, ¶ 12, 266 P.3d at 736.  In that case, the policy covered "all Loss . . . arising from any Claim made against the Insureds during the Policy Period," including "Costs of Defense," defined as "reasonable and necessary fees, costs, and expenses . . . resulting solely from the investigation, adjustment, defense and appeal of any Claim against the Insureds," whether in or out of court  *Id.*  The Utah Court of Appeals had ruled that the circumstances triggering that clause "constitute objective facts, the truth or falsity of which are not determined solely by the allegations" or caption of the complaint. *Equine Assisted Growth & Learning Ass'n v. Carolina Cas. Ins. Co.*, 2009 UT App 200, at ¶ 7, 216 P.3d at 972. The Utah Supreme Court agreed: "we conclude that *the relevant contractual provision ties the duty to defend to facts not contained in the complaint.*  As a result, we hold that extrinsic evidence is necessary to determine whether Carolina Casualty had a duty to defend EAGALA." 2011 UT 49, at ¶ 12, 266 P.3d at 736 (emphasis added).

[23](Exhibit 3 to Declaration of Bart Naylor, filed June 14, 2011 (CM/ECF No. 28) ("Naylor Decl." ), at § I, ¶ 1.a.)

seeking those damages.  However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. We may, at our discretion, investigate any "occurrence" and settle any claim or "suit" that may result.[24]

Cincinnati's policies define "suit" as follows:

"Suit" means a civil proceeding in which money damages because of "bodily injury", "property damage" or "personal and advertising injury" to which this insurance applies are alleged.  "Suit" includes:

a.     An arbitration proceeding in which such damages are claimed and to which the insured must submit or does submit with our consent;

b.     Any other alternative dispute resolution proceeding in which such damages are claimed and to which the insured submits with our consent; or

c.     An appeal of a civil proceeding.[25]

As far as the Nevada civil litigation is concerned, this policy language conditions

Cincinnati's duty to defend AMSCO  upon allegations contained on the face of the complaint,

without resort to extrinsic evidence of the facts underlying the claim.[26]

---

[24](Exhibit 5 to Naylor Decl. at § I, ¶ 1.a.)

[25](*Id.* at § V, ¶ 21; *see* Exhibits 3 & 4 to Naylor Decl. at § V, ¶ 16; Exhibits 6 & 7 to Naylor Decl. at § V, ¶ 21.)

[26]Cincinnati correctly points out that "there is no duty to defend or indemnify an insured if the allegations of the complaint are not directed against the insured or if the insured is not a named party to the underlying litigation," and thus cannot be held liable.  (The Cincinnati Insurance Company's Reply Memorandum in Support of its Cross-motion for Summary Judgment Against AMSCO Windows, filed November 28, 2011 (CM/ECF No. 56) ("Cincinnati Reply"), at 21 (citing *University of Utah Hospital v. American Casualty Co. of Reading*, 2004 UT App. 111, ¶¶ 10-12, 90 P.3d 654, 657).  Yet Cincinnati acknowledges that "J&L has filed third and fourth party complaints against AMSCO, alleging that AMSCO negligently designed and/or manufactured its windows among other causes of action, which caused water infiltration damage to property around the windows . . . including wallboard, the structure of the homes, floorboards and other property," for which J&L contends AMSCO should be held liable.

(continued...)

The Nevada homeowners' Chapter 40 notices present a different question.  The Nevada

Chapter 40 process contemplates an informal resolution of homeowner complaints regarding

construction defects through notice, inspection and repair by the construction contractor and its

subcontractors, but does not itself provide for compulsory arbitration of the homeowners'

construction defect claims.[27]  The Chapter 40 process thus does not constitute a "suit" within the

terms of Cincinnati's CGL policies unless, as set forth above, the homeowners claim "property

damage" covered by the policy and AMSCO participates in this alternate dispute resolution

process with Cincinnati's consent.[28]  Absent Cincinnati's consent, AMSCO's receipt of a Chapter

_____

[26](...continued)
(Cincinnati Opp. Mem. at 78-79.)

[27]A homeowner sends a Chapter 40 notice and affords the contractor (and subcontractors) an opportunity to inspect and offer to repair claimed defects as a prerequisite to filing a lawsuit. A contractor must forward Chapter 40 notices it receives to its subcontractors or lose its right to sue them if the matter goes to litigation.

[28]The Nevada statute attempts to force the coverage issue by providing that:

   1.  If a contractor, subcontractor, supplier or design professional receives written notice of a constructional defect, the contractor, subcontractor, supplier or design professional may present the claim to an insurer which has issued a policy of insurance that covers all or any portion of the business of the contractor, subcontractor, supplier or design professional.

   2.  If the contractor, subcontractor, supplier or design professional presents the claim to the insurer pursuant to this section, the insurer:

   (a) *Must treat the claim as if a civil action has been brought* against the contractor, subcontractor, supplier or design professional; and

   (b) *Must provide coverage to the extent available under the policy of insurance as if a civil action has been brought* against the contractor, subcontractor, supplier or design professional.

(continued...)

-19-

40 notice may not trigger Cincinnati's duty to defend under its CGL policies.

**Cincinnati's Theory of Coverage**

As pleaded in its Complaint, Cincinnati's defense of AMSCO's assertion of coverage forms essentially along two lines: (1) that the claims asserted against AMSCO involve losses that did not result from an "occurrence" within the meaning of its general or umbrella liability policies; and (2) even if the losses resulted from an "occurrence," they fall within one or more express exclusions from coverage under Cincinnati's policies.[29]

On the parties' cross-motions for summary judgment, Cincinnati contends that "[u]nder Utah law, AMSCO's alleged negligence in manufacturing defective windows does not constitute an 'occurrence' within the meaning of Cincinnati's insurance policies."[30]  Therefore, there is no

---

[28](...continued)

    3.  A contractor, subcontractor, supplier or design professional is not required to present a claim to the insurer pursuant to this section, and the failure to present such a claim to the insurer does not relieve the insurer of any duty under the policy of insurance to the contractor, subcontractor, supplier or design professional.

Nev. Rev. Stat. § 40.649 (emphasis added), *available at* http://www.leg.state.nv.us/nrs/nrs-040.html#NRS040Sec649.  This attempt to dictate the scope and meaning of insurance policy language by legislative fiat raises some intriguing legal questions, but given AMSCO's insistence that Utah law governs the construction of Cincinnati's policies in this case, this court need not decide those questions.

[29]Cincinnati's Complaint pleads that coverage of AMSCO's potential liability is denied under the following exclusions: (1) Expected or Intended Injury, (2) Contractual Liability, (3) Damage to Property, (4) Damage to Your Product, (5) Damage to Your Work, (6) Damage to Impaired Property, and (7) Recall of Products.  (*See* Complaint at 8-9, 14-15, 22-24 ¶¶ 20, 23, 33.)  AMSCO moved for summary judgment that none of these exclusions apply to the claims that AMSCO has called upon Cincinnati to defend.  (*See* AMSCO Mem. at 14-23.)

[30](The Cincinnati Insurance Company's Memorandum of Points and Authorities in Support of Motion for Summary Judgment Against AMSCO Windows, filed October 11, 2011

(continued...)

coverage under the terms of its policies for AMSCO with respect to the claims asserted in the

underlying Nevada litigation, and Cincinnati has no duty to defend or indemnify AMSCO under

the terms of its insurance policies for any of the claims asserted in the underlying Nevada

litigation against AMSCO.[31]

### The Meaning of "Occurrence"

The coverage dispute between Cincinnati and AMSCO mainly arises out of the definition

of "occurrence" contained in Cincinnati's CGL policies.  The CGL policies cover AMSCO's

losses for "those sums that the insured [AMSCO] becomes legally obligated to pay as damages

because of . . . 'property damage' to which this insurance applies."[32]  This insurance coverage

"applies . . . to 'property damage' only if: (1) The . . . 'property damage' is caused by an

'occurrence'. . . ."[33]  Cincinnati's CGL policies define an "occurrence" as meaning "an accident,

including continuous or repeated exposure to substantially the same general harmful

conditions."[34]  The policies do not further define the term "accident," and they offer little or no

additional guidance delineating the nature of a covered "occurrence."

---

[30](...continued)
(CM/ECF No. 49) ("Cincinnati Mem."), at 12, 22.)  Cincinnati asserts that "Utah case law has
historically recognized that an insured's slipshod construction or negligent work is not an
accident or occurrence under a general liability policy," but does not cite any Utah Supreme
Court cases lending direct support to this assertion.  (Cincinnati Opp. Mem. at 84.)

[31](Cincinnati Mem. at 22-23.)

[32](Exhibits 3, 4, 5, 6 & 7 to Naylor Decl. at § I, ¶ 1.a.)

[33](Exhibits 3, 4, 5, 6 & 7 to Naylor Decl. at § I, ¶ 1.b(1).)

[34](Exhibits 3 & 4 to Naylor Decl. at § V, ¶ 12; Exhibits 5, 6 & 7 to Naylor Decl. at § V, ¶
16.)  In this respect, Cincinnati's umbrella policy language does not differ in any material way
from the CGL policy language quoted above.  Therefore, for purposes of these motions, the
coverage analysis applies to both types of policies.  (*See* Cincinnati Mem. at 11 ¶ 31.)

The adoption of the term "occurrence" to define coverage of an insured loss represents one step in the continuing evolution of standard CGL insurance policies:

> After 1966, the term "occurrence" replaced the term "accident," in the standard CGL policy as the event triggering coverage. The "occurrence" language is generally understood to offer broader coverage than that offered by the former term, "accident." 11 G. Couch, *Couch on Insurance 2d* § 44:285 at 437 (1982). The change to occurrence-based coverage was made in response to the need for coverage against damages resulting from continued or repeated exposure. . . .

*United States Fidelity & Guar. Co. v. Morrison Grain Co.*, 734 F. Supp. 437, 443 (D. Kan. 1990); *accord*, 1 R. Long, The Law of Liability Insurance § 1.21, at 1-88 (1990); 7A J. Appleman, Insurance Law and Practice §§ 4492-93 (Berdal ed. 1979).[35]  Adopting the concept of "occurrence" in order to broaden the available coverage was wholly consistent with the overall purpose of a CGL policy:

> The primary purpose of a comprehensive general liability policy is to provide broad comprehensive insurance. Obviously the very name of the policy suggests the expectation of maximum coverage. Consequently the comprehensive policy has been one of the most preferred by businesses and governmental entities over the years because that policy has provided the broadest coverage available. All risks not expressly excluded are covered, including those not contemplated by either party.

*James Graham Brown Foundation, Inc. v. St. Paul Fire & Marine Ins. Co.*, 814 S.W.2d 273, 278 (Ky. 1991) (citing Note, *The Applicability of General Liability Insurance to Hazardous Waste Disposal*, 57 S. Cal. L. Rev. 745 (1984)).  Moreover, "[c]ourts and commentators alike are in agreement that the term 'occurrence' is to be broadly and liberally construed in favor of

---

[35]Courts have acknowledged the difference.  *See, e.g.,Vermont Mut. Ins. Co. v. Malcolm*, 128 N.H. 521, 523, 517 A.2d 800, 802 (1986) (explaining that "occurrence" has a broader meaning than "accident" because "occurrence" includes "an injurious exposure to continuing conditions as well as a discrete event"); *cf. Green v. State Farm Fire & Cas. Co.*, 2005 UT App 564, ¶ 22, 127 P.3d 1279, 1283 ("An occurrence is an accident.").

extending coverage to the insured." *Id.* (citing *Buckeye Union Ins. Co. v. Liberty Solvent & Chem. Co., Inc.*, 17 Ohio App.3d 127, 477 N.E.2d 1227 (1984)); *see also United States Fidelity & Guar. Co. v. Sandt*, 854 P.2d at 522-23.

Counsel for the parties proffer competing readings of a series of cases decided by the Utah Supreme Court and by federal courts—both this District and the Tenth Circuit—applying Utah law to decide the question of "occurrence."

### The Utah Cases

In *Hoffman v. Life Ins. Co.*, 669 P.2d 410 (Utah 1983), the Utah Supreme Court considered whether the death of the insured was "accidental" within the meaning of his insurance policy.  Mr. Hoffman was shot to death by police officers during an armed confrontation that took place after the insured had parked his vehicle in his driveway at the end of a chase on and off the freeway.  At the time, the insured was very distraught and probably intoxicated.   The insurer argued that Hoffman's death was not "accidental" because it was a reasonably foreseeable consequence of his actions, and that "every person is held to intend the natural and probable consequences of his actions," echoing the language of *Richards v. Standard Accident Ins. Co.*, an earlier Utah case.[36]  669 P.2d at 415.

---

[36]*Richards v. Standard Accident Ins. Co.*, 58 Utah 622, 200 P. 1017, 17 A.L.R. 1183 (1921).  Examining the meaning of "accidental" at some length, the *Richards* court quoted from Judge Sanborn's opinion in *Western Commercial Travelers' Ass'n v. Smith*, 85 F. 401, 405, 29 C.C.A. 223, 56 U.S. App. 393, 40 L.R.A. 653 (8th Cir. 1898):

"'The significance of this word "accidental" is best perceived by a consideration of the relation of causes to their effects.  The word is descriptive of means which produce effects which are not their natural and probable consequences. *The natural consequence of means used is the consequence which ordinarily follows from their use--the result which may be reasonably anticipated from their use,*

(continued...)

The *Hoffman* court began its analysis with the *Richards* standard: "a person is a victim of an accident when, from the victim's point of view, the occurrence causing the injury or death is not a *natural and probable* result of the victim's own acts." *Id.* at 416 (emphasis in original). Observing that "[t]he standard stated in *Richards* has been applied consistently by this Court,"[37] *Hoffman* then drew a distinction between that standard and the foreseeable consequences of the

------

[36](...continued)
*and which ought to be expected. The probable consequence of the use of given means is the consequence which is more likely to follow from their use than it is to fail to follow. An effect which is the natural and probable consequence of an act or course of action is not an accident, nor is it produced by accidental means. It is either the result of actual design, or it falls under the maxim that every man must be held to intend the natural and probable consequence of his deeds.* On the other hand, an effect which is not the natural or probable consequence of the means which produced it, an effect which does not ordinarily follow and cannot be reasonably anticipated from the use of these means, an effect which the actor did not intend to produce, and which he cannot be charged with the design of producing under the maxim to which we have adverted, is produced by accidental means. It is produced by means which were neither designed nor calculated to cause it. Such an effect is not the result of design, cannot be reasonably anticipated, is unexpected, and is produced by an unusual combination of fortuitous circumstances; in other words, it is produced by accidental means.'"

58 Utah at 636, 200 P. at 1023 (emphasis added). The highlighted language appears to be that most often quoted as the *Richards* standard.

[37]*Hoffman* explained that *Richards* and the cases applying the *Richards* standard, *e.g.*, *Handley v. Mutual Life Insurance Co.*, 106 Utah 184, 192, 147 P.2d 319, 322 (1944),

are somewhat confusing in their use of terms such as "unforeseen," *e.g.*, *Handley*, *supra*, 106 Utah at 190, 147 P.2d at 322, and "[not] reasonably anticipated," *e.g.*, *Richards*, *supra*, 58 Utah at 636, 200 P. at 1023, in describing what constitutes an accident. Those terms seemingly imply that if the insured negligently causes his or her own death, it is not an accident. That position, however, was rejected in *Richards*, *supra*, which held that unless the policy otherwise provides, the negligence of the insured could not be raised as a defense by the insurer.

669 P.2d at 416.

insured's own negligence: "[a]s this Court stated in *Kellogg*, *supra*, 114 Utah at 572, 201 P.2d at

952, the test is not whether the result was foreseeable, but whether it was expected. *See also*

*Schmidt v. Industrial Commission*, Utah, 617 P.2d 693 (1980) (Wilkins, J., concurring)

("accident" is "an unlooked for mishap which is not expected or designed")." *Id.*[38]

       The doctrine of foreseeability is used in tort law to establish the scope of
the duty of a person to exercise reasonable care to avoid harming others.  In
insurance law, however, the issue is one of contractual meaning, i.e., what is the
nature of the risk described by the term "accident" or "accidental" that the
insurance company insures against.  In construing such contractual provisions, our
point of view is "that of the average man." [*Handley*], 106 Utah at 190, 147 P.2d
at 322 (quoting *Lewis v. Ocean Accident & Guarantee Corp.*, 224 N.Y. 18, 21,
120 N.E. 56, 57 (1918)).  Accident insurance policies "are purchased with the
understanding that if death results from an unintended or an intended cause where
it was not the expected but the supposedly improbable result[, the death is]
covered by the policy." *Handley*, *supra*, 106 Utah at 190, 147 P.2d at 322.  The
layman views an accident as any result which is not expected. *See Kellogg*, 114
Utah at 572, 201 P.2d at 951–52 (discussing *Handley*).  Webster states that
"EXPECT usually implies a high degree of certainty . . ." and defines the term as
"to consider probable or certain . . . ." *Webster's Third International Dictionary*
(1976).

       Thus, since the common meaning of the term is defined in terms of
whether the event was naturally and probably expected or anticipated by the
insured,  *see Freeman v. Commonwealth Life Insurance Co.*, 149 Ind. App. 211,
271 N.E.2d 177 (1971), *aff'd*, 259 Ind. 237, 286 N.E.2d 396 (1972), it is that
definition which must be applied, and not one founded on foreseeability.

---

   [38]*Hoffman* noted that "[o]ther courts which have addressed the issue are in accord with
*Richards*," citing 43 Am. Jur. 2d *Insurance* § 557 (1982), and that "[i]n the analogous area of
liability insurance, courts have generally held that 'accident' includes results negligently caused
by the insured." *Id.* at 416 n.2 (citing 43 Am. Jur. 2d *Insurance* § 710 (1982); Annot., 7 A.L.R.
3d 1262 (1966)).

   This remains true today: "The majority insurance rule is that loss resulting from ordinary
negligence of an insured or the insured's agent may be considered as injury or damage caused by
'accident' as provided for in the coverage of an insurance policy covering liability for injury or
damage 'caused by accident.'" 16 Eric M. Holmes, *Holmes' Appleman on Insurance 2d* § 117.4,
at 344 (2000) (footnote omitted); *accord* 43 Am. Jur. 2d *Insurance* § 681 (2003 & Supp. 2012).

*Id.* (quoting *Handley*, 106 Utah at 192, 147 P.2d at 322).[39]

---

[39]In *Handley*, the Utah Supreme Court discussed the meaning of "accidental" in terms of an event's "natural and probable" consequences:

[T]here is . . . substantial authority for the proposition that whether the means are accidental is determined by the character of their effects.

"*Accidental means are those which produce effects which are not their natural and probable consequences*. The natural consequence of means used is that consequence which ordinarily follows from its use, the result which may be reasonably anticipated from its use--and which ought to be expected. The probable consequence of the use of a given means is the consequence which is more likely to follow from its use than it is to fail to follow." (Italics part of quotation.) Vol. 6, Cooley's Briefs on Insurance, 2nd Ed., p. 5234.

In one sense every effect following from a cause operating under the conditions under which it did operate is the natural result of that cause. Given that particular set of conditions the result was inevitable and natural in the sense that according to the laws of nature and of physics, absent something supernatural, such could only be the result. But the term natural is not used in that respect. Its meaning is as above stated. . . .

106 Utah at 195, 147 P.2d at 324 (emphasis in original).

In *Kellogg v. California Western States Life Ins. Co.*,114 Utah 567, 201 P.2d 949 (1949), the Utah court concluded that the insured's death from post-operative complications was not accidental because the

Deceased's previous experiences with shock from a lesser operation coupled with his physical condition, including that disclosed upon the initiation of the second operation, viewed in the light of the nature and the length of time required to accomplish this second operation, are all facts which support the belief that death was not accidental. Post-operative shock to a dangerous degree was very likely to him. He was a poor risk, as one doctor indicated. His history made a bad prognosis, said the other.
* * * *
Certainly the rule of unexpectedness must be governed by the facts evidencing a susceptibility of the victim to the attendant results. . . . If a deceased is in a physical condition which has reduced his resistance, it stands to reason that he is

(continued...)

-26-

In *Hoffman*, the insured's death during the confrontation with three police officers was foreseeable, but was not the expected or probable result unless "Hoffman did in fact directly threaten the lives of the officers" when he was emerging from his vehicle holding a gun.  *Id.* at 418.

In *Nova Casualty Co. v. Able Construction, Inc.*, 1999 UT 69, 983 P.2d 575, the Utah Supreme Court considered whether an insurer had a duty to defend claims against its insured for intentional misrepresentation, negligent misrepresentation, and breach of warranty. The court ultimately held that allegations of intentional misrepresentation and negligent misrepresentation in conjunction with the sale of real property do not constitute an "occurrence" or "accident" under a commercial general liability insurance policy.  The *Nova Casualty* court first determined that intentional misrepresentation is a willful misrepresentation, as is fraud, and thus cannot be an "accident" covered by the policy; in addressing negligent misrepresentation, the court explained that "allegations of negligent misrepresentation are not an occurrence or accident under commercial general liability insurance policies because the insured had the intent to induce reliance," and the buyers' reliance was the intended result.  1999 UT 69, at ¶¶ 14, 16, 983 P.2d at 579, 580.[40]  *Nova Casualty* distinguished *Hoffman*—which the trial court had relied upon "for the

---

[39](...continued)
not going to withstand an operation as well as the normal man.  If, in addition to that strain he is susceptible to shock, it seems almost conclusive that serious results may be likely.

114 Utah at 573-74, 201 P.2d at 952-53.

[40]In *Green v. State Farm Fire & Cas. Co.*, 2005 UT App. 564, ¶ 25, 127 P.3d 1279, 1284, the Utah Court of Appeals concluded that the insured land developers' failure to disclose the risk
(continued...)

proposition that the term 'accident' in liability insurance contracts includes damages resulting

from negligent conduct"—from its insureds' failure to disclose the risk of landslide:

> Here, the alleged harm may have resulted from a negligently wrong
> representation, but it was a representation intentionally made with the purpose of
> inducing the actions taken by the buyers.  In *Hoffman* . . . the negligent actions of
> the defendants produced an unintended result—accidental death.  Because the
> consequence of the defendants' actions here was intended, we decline to hold that
> the action can be defined as an accident.

*Id.* at ¶¶ 15-16, 983 P.2d at 580.[41]

In *N.M. ex rel. Caleb v. Daniel E.*, 2008 UT 1, 175 P.3d 566, the Utah Supreme Court

considered whether a serious head injury caused by an eight-year-old child striking another child

with a hockey stick was the intended or expected result of an "accident" within the meaning of a

homeowner's liability insurance policy.[42]  Again invoking the *Richards* standard, the court

explained that harm or damage "is not accidental if it is the result of actual design or intended by

the insured," or it "is not accidental if it is the natural and probable consequence of the insured's

act or should have been expected by the insured."  2008 UT 1, at ¶ 7, 173 P.3d at 569 (footnote

---

[40](...continued)
of a landslide to lot purchasers was not an accidental "occurrence" covered by their liability
policy.  *Green* primarily relied on *Nova Casualty* in reaching that result: "'[N]egligent
misrepresentations causing investment loss or loss of other economic interest are considered
purposeful rather than accidental for the purpose of insurance coverage'" *Id.* at ¶ 28 (quoting
*Nova Cas. Co.*, 1999 UT 69 at ¶ 16, 983 P.2d 575).

[41]*Nova Casualty* also distinguished *Allstate Insurance Co. v. Worthington*, 46 F.3d 1005,
1011 (10th Cir. 1995), on the same basis.  As explained *infra*, *Worthington* had observed that
"[t]he Utah court also has noted that in a liability policy, 'courts have generally held that
'accident' includes results negligently caused by the insured,'" quoting *Hoffman*.

[42]The policy provided coverage for "damages because of bodily injury or property
damage caused by an occurrence."  The policy in turn defined an "occurrence" as "an accident,
including exposure to conditions which result in: bodily injury; or property damage."

omitted).  "The first category presents a factual question as to what the insured intended. The

second category generally presents a legal question as to what the average individual would

expect to happen under the circumstances."  *Id.*, 173 P.3d at 569-70 (citing *Hoffman*, 669 P.2d at

419).  The court next undertook to "resolve the question of whether we focus on the actions of

the tortfeasor or the resulting injury as being accidental in nature," noting that "[a]ccording to

this court's clear precedent, we focus on the accidental nature of the injury."  *Id.* at ¶ 10, 173 P.3d

at 570.  The court rejected the reasoning of the Utah Court of Appeals in two cases that focused

on the nature of the insured's actions "because it conflicts with this court's clear precedent":

> First, we have clearly held that we do not examine whether an act is intentional or
> deliberate, but rather whether the result was intended or expected . . . .  Second,
> the language adopted by the Utah Court of Appeals . . . improperly introduces the
> concept of foreseeability to the definition of  "accident." . . . We have clearly held
> that "the test is not whether the result was foreseeable, but whether it was
> expected."

*Id.* at ¶ 11, 173 P.3d at 570-71 (quoting *Hoffman*, 669 P.2d at 416) (footnotes omitted).[43]  Indeed,

relying on foreseeability to define an accidental occurrence under an insurance policy would

defeat the very purpose of liability insurance:

> If foreseeability were the measure of what constitutes an accident, then
> Safeco and other insurers with similar policies would never have a duty to

---

[43]That the degree or extent of injury or damage was unintended or unexpected by the
insured does not render the result "accidental":

> As long as some sort of injury was intended or expected, the actual injury suffered
> is not accidental even if the actual injury differs in nature or degree from what
> might have been reasonably anticipated.  Only where the injury suffered is
> completely disproportionate to the injury intended or reasonably expected would
> the actual injury be considered accidental in nature.

*Id.* (footnote omitted).

-29-

indemnify policy holders, rendering coverage completely illusory.  Under
traditional notions of tort law, individuals are liable for only the foreseeable harm
of their negligent acts.  Therefore, if an injury is unforeseeable, the insured would
not be liable and the insurer would have no duty to indemnify.  If, on the other
hand, an injury is foreseeable, the insurer could avoid the duty to indemnify by
asserting that the injury was not an accident.

*Id.* at ¶ 11 n.7, 175 P.3d at 571 n.7.

A year later, in *Helf v. Chevron U.S.A., Inc.*, 2009 UT 11, 203 P.3d 962, the Utah

Supreme Court summarized its ruling in *N.M. ex rel. Caleb v. Daniel E.* as follows:

In *N.M. v. Daniel E.*, we held that to determine whether an injury is intentional or
accidental, we consider whether "the result was intended or expected," rather than
focusing on whether the act causing the injury was intentional.  Under this
approach, an intentional act "may result in an accident if the *result* was
unexpected [and] unanticipated."  The corollary to this holding is that an act is not
accidental if the *result* was expected and anticipated, even if the actor subjectively
hoped that injury would not occur.  Thus, a speeding motorist who collides with
another vehicle is still involved in an "accident" because "while the motorist did
intend to exceed the speed limit, he did not intend to cause a collision."  Under
this standard, intent attaches "not based on a recognition of what possibly could
happen, but rather, what probably would happen."

2009 UT 11, at ¶ 29, 203 P.3d at 970-71 (emphasis in original; footnotes omitted).[44]

From these Utah cases, we may glean that the fact that injury or damage may be the

foreseeable consequence of the insured's own negligence does not foreclose a finding that such

injury or damage was accidental, and resulted from an "occurrence" within the meaning of a

commercial general liability policy.  Indeed, the Utah Supreme Court's emphatic rejection of

foreseeability as the measure of the accidental nature of injury or damage resulting from the

insured's conduct precludes any notion that the intended, expected or even the "natural and

---

[44]*Helf* observed that '[b]y focusing the court's attention on the subjective knowledge or
expectation of the actor, the 'intent to injure' standard aids in distinguishing between an
intentional injury and an accidental injury that arises from an intentional decision."  2009 UT 11,
at ¶ 30, 203 P.3d at 971.

probable" consequences of the insured's actions may be equated with the "foreseeable"

consequences of the insured's negligence.  As the Utah Supreme Court explained in *N.M. ex rel.*

*Caleb v. Daniel E.*, "We have clearly held that 'the test is not whether the result was foreseeable,

but whether it was expected.'" 2008 UT 1, at ¶ 11, 173 P.3d at 571 (quoting *Hoffman*, 669 P.2d

at 416).

**The Federal Cases**

Several recent cases decided in this District have undertaken to apply the Utah law

defining occurrences in terms of accidental injury or damage in the liability insurance context.

In *H.E. Davis & Sons, Inc. v. North Pacific Insurance Co.*, 248 F. Supp. 2d 1079 (D. Utah

2002), a case involving a plaintiff insured's failure to adequately prepare and compact soils for a

lot upon which a school was to be built, the defendant insurance company argued that the

insured's inadequate preparation of the soil at the building site "was not an 'accident' because

plaintiff *intended* to perform adequately, but apparently did so *negligently*.  Thus, regardless of

plaintiff's negligence or the ultimate poor quality of its work, plaintiff could *foresee* the natural

consequences of its actions." *Id.* at 1084 (emphasis in original).[45]  Judge Sam agreed, noting that

─────────────────

[45]The court noted that the insurer cited to "Utah case law and cases from other
jurisdictions which generally define an 'accident' as something which is *not* a natural or intended
consequence and *not* the result of negligence," including *Fire Ins. Exch. v. Estate of Therkelsen*,
27 P.3d 555, 559 (Utah 2001), and *Fire Ins. Exch. v. Rosenberg*, 930 P.2d 1202, 1205–06
(Utah Ct. App. 1997).  *Id.* at 1084 & n.4.  Further, the court explained that "[i]n *Nova Casualty
Company v. Able Construction, Inc.*, 983 P.2d 575 (Utah 1999), the Utah Supreme Court,
interpreting a commercial general liability policy containing the identical definition of
'occurrence' as that in this case, held that negligent misrepresentation is not an 'occurrence'
or an 'accident' under a commercial general liability policy.  *See Nova Casualty*, 983 P.2d at
579–80." *Id.*

As explained above, *Nova Casualty* concluded that negligent misrepresentation involved
conduct having an *intended* result under the *Richards* standard.  983 P.2d at 580 ("the alleged
(continued...)

the insured had "failed to adequately compact the soil, with natural and foreseeable results.  So long as the consequences of plaintiff's work were natural, expected, or intended, they cannot be considered an 'accident.'  If there is no 'accident,' there is no 'occurrence' to trigger coverage under the [p]olicy."  *Id.* (footnote omitted).  *H.E. Davis & Sons* did not squarely address claims of resultant damage to other property as resulting from an occurrence.[46]

---

[45](...continued)
harm may have resulted from a negligently wrong representation, but it was a representation intentionally made with the purpose of inducing the actions taken by the buyers.")  *Nova Casualty* does *not* say that an "accident" is "not the result of negligence."

In *Therkelsen*, the insured had forced his way into the plaintiff's residence brandishing a handgun and shot and wounded the plaintiff during the altercation.  The court rejected the argument that the shooting was an "occurrence" that resulted from negligence: "Therkelsen's actions, entering the home at gunpoint, loading the handgun, and pointing it toward Ness, all demonstrate an intentional shooting," and the wounding of Ness "was the natural and probable consequence of Therkelsen's actions."  27 P.3d at 559.

In *Fire Insurance Exchange v. Rosenberg*, 930 P.2d 1202 (Utah Ct. App. 1997), the court of appeals examined whether tossing a lit cherry bomb onto the property of another had produced an "accident."  The court of appeals held that the injury in question was not accidental because it was a foreseeable result of the deliberate act of throwing the cherry bomb.  *Id.* at 1205. *Rosenberg* is one of the two cases whose foreseeability analysis was expressly disapproved by the Utah Supreme Court in *N.M. ex rel. Caleb v. Daniel E.* because it "improperly introduces the concept of foreseeability to the definition of 'accident.'"  2008 UT 1, ¶ 11, 175 P.3d at 571 (citing *Rosenberg*, 930 P.2d at 1205, as "erroneously holding that the resulting injury need only 'fall within the spectrum of foreseeability'").

None of the Utah cases discussed in *H.E. Davis & Sons, Inc.* squarely address the question whether negligence may result in an accidental "occurrence," and thus they do not stand for the proposition that an "accident" is "something which is . . . not the result of negligence." *Hoffman* clearly pointed toward the opposite conclusion, as does *N.M. ex rel. Caleb v. Daniel E.*, decided nearly six years after *H.E. Davis & Sons*.

[46]Nor did the cases upon which it relied, such as *Nova Casualty* and *Therkelsen*, discussed *supra*.  The other cases relied upon in *H.E. Davis & Sons* addressed only defective construction standing alone, not claims of resultant damage to other property.  *See Swarts v. Woodlawn, Inc.*, 610 So.2d 888, 890 (La. Ct. App. 1992) (saying that where a policy defines "occurrence" as "an accident," and where the liability of a contractor is based solely on improper construction, courts have refused to find an "occurrence"); *Hawkeye–Sec. Ins. Co. v. Vector Constr. Co.*, 185 Mich.App. 369, 460 N.W.2d 329, 334 (1990) (defendant's "defective workmanship, standing

(continued...)

In *Great American Ins. Co. v. Woodside Homes Corp.*, 448 F. Supp. 2d 1275 (D. Utah 2006), Judge Campbell summarized *H.E. Davis & Sons, Inc.* in these terms: "the court held that Utah law does not consider negligent work performed by an insured to be an occurrence because the consequences of negligent work are reasonably foreseeable and therefore no 'accident' resulting from that work can occur." *Id.* at 1280.   In *Woodside Homes*, the insured asserted coverage under its general liability insurance policies for claims arising from allegedly defective home construction by the insured's subcontractors.   The question presented was "whether faulty work performed by an insured's subcontractor can be considered an accident, and therefore an occurrence" within the meaning of the insured's policies.   *Id.*   Judge Campbell pointed to language in the *Hoffman* case saying that "a person is a victim of an accident when, from the victim's point of view, the occurrence causing the injury . . . is not a natural and probable result of the victim's own acts, " 669 P.2d at 416, and concluded that "[g]iven the Utah Supreme

----

⁴⁶(...continued)
alone, was not the result of an occurrence within the meaning of the [commercial general liability] insurance contract").

Moreover, *Solcar Equip. Leasing Corp. v. Pa. Mfrs. Ass'n Ins. Co.*, 414 Pa.Super. 110, 606 A.2d 522, 527 (1992) (concluding that plaintiff's negligent, "slipshod construction work" is "not an accident or occurrence" under a general liability policy), appears to be footed upon a misreading of a prior Pennsylvania Supreme Court opinion in *Gene & Harvey Builders v. Pa. Mfrs. Ass'n*, 512 Pa. 420, 517 A.2d 910 (1986), as holding "that an occurrence does not encompass negligence." 606 A.2d at 527.   *Gene & Harvey Builders* held that "alleged intentional concealing of the condition of the land or the alleged intentional misrepresentation are not "occurrences" under the policy," and that "the alleged negligent conduct–whether it was actually negligent or not" was clearly subject to *exclusions* set forth in the policy.   512 Pa. at 427, 428, 517 A.2d at 913, 914.   The Pennsylvania Supreme Court did *not* say an occurrence does not encompass negligence.   Four years earlier, *Barber v. Harleysville Mut. Ins. Co.*, 304 Pa. Super. 355, 450 A.2d 718 (1982), had reached the opposite conclusion: "Since negligence frequently involves an accident, the occurrence of which was neither expected nor intended by the actor," the insured's "negligence would be an 'occurrence'" as to which the insurer had a duty to defend. 450 A.2d at 720.

-33-

Court's focus on the acts of the insured when determining whether there has been an occurrence, it follows that the negligent acts of Woodside's subcontractors can be considered an occurrence from Woodside's 'point of view,'" and "that defective subcontractor work is covered under policies like that at issue here."  448 F. Supp. 2d at 1282.

In a more recent case involving facts strikingly similar to this one, Judge Campbell relied upon her own opinion in *Woodside Homes*—which in turn relied on *H.E. Davis & Sons*—to deny coverage under a general liability policy for property damage resulting from alleged construction defects involving windows, doors and frames supplied by the insured.  *Cincinnati Ins. Co. v. Linford Bros. Glass Co.*, No. 2:08-CV-387-TC, 2010 WL 520490, 2010 Lexis 11226 (D. Utah, decided Feb. 9, 2010).  The *Linford* opinion decided the "occurrence" question in a single paragraph:

> Under Utah law, "the consequences of negligent work are reasonably foreseeable and therefore no 'accident' resulting from that work can occur." *Great Amn. Ins. Co. v. Woodside Homes Corp.*, 448 F. Supp. 2d 1275, 1280 (D. Utah 2006), citing *H.E. Davis & Sons, Inc. v. N. Pac. Ins. Co.*, 248 F. Supp.2d 1079, 1084 (D. Utah 2006). Because the reasonably foreseeable consequences of negligently manufacturing windows and doors include damage to the property in which the defective products are installed, there can be no "occurrence" here under Utah law. As a result, Cincinnati owes no duty to defend or indemnify Linford in the underlying California actions or to contribute to or indemnify Arrowood for defense costs or fees paid by Arrowood in the underlying California actions.

2010 WL 520490, at *3.  As in *H.E. Davis & Sons*, the "occurrence" question was decided in terms of *foreseeability*—an approach that has been explicitly rejected by the Utah Supreme Court, first in *Holland* and more recently in *N.M. ex rel. Caleb v. Daniel E.*[47]

---

[47]In *Essex Ins. Co. v. Wake Up Too, Inc.*, Civil No. 2:07-CV-312 DAK, 2009 WL 357987 (D. Utah 2009), Judge Kimball addressed the accidental "occurrence" issue where a private club
(continued...)

-34-

In *Employers Mut. Cas. Co. v. Bartile Roofs, Inc.*, 618 F.3d 1153 (10th Cir. 2010), the court of appeals followed the lead of *Woodside Homes* and *H.E. Davis & Sons, Inc.* in stating that "[u]nder Wyoming and Utah law, 'the natural results of [an insured's] negligent and unworkmanlike construction do not constitute an occurrence triggering coverage under a [CGL] policy.'" 618 F.3d at 1174.[48]

---

[47](...continued)
patron had suffered a serious head injury during an altercation with the club's security guards, observing that "[i]In *Caleb*, the Utah Court determined that there are two independent methods by which bodily injury or property damage may be deemed "nonaccidental" in Utah, only one of which is relevant in this case. Essex claims that, under *Caleb*, the harm or damage is not accidental if it is the natural and probable consequence of the insured's act or should have been expected by the insured." *Id.* at *6 (citing *N.M. ex rel. Caleb v. Daniel E.*, 175 P.3d at 569-70). Judge Kimball ruled "that the court cannot, as a matter of law, conclude that the injuries were proportionate to the injury that the security guards should have reasonably intended or expected. In other words, the court cannot, on a motion for summary judgment, conclude that there was no "occurrence" covered by the policy." *Id.* at *7. In doing so, he rejected the insurer's argument that "no reasonable person could find" that the patron's head injuries "are disproportionate to the injuries that were reasonably foreseeable by the security guard." *Id.*

[48]The *Bartile* panel also cites *Great Divide Ins. Co. v. Bitterroot Timberframes of Wyoming, LLC*, 2006 WL 3933078, 2006 U.S. Dist. LEXIS 94826 (D. Wyo. 2006), as "holding that an event is not an 'accident' under Wyoming law if defendant breached the underlying construction contract and the damages are 'the natural and foreseeable result' of an insured's negligent construction work." 2006 WL 3933078, at *8. *Great Divide* in turn relied upon *H.E. Davis & Sons* and *Woodside Homes* as support for the proposition that

> many jurisdictions hold that the natural results of negligent and unworkmanlike construction do not constitute an occurrence triggering coverage under a Commercial General Liability policy. *Great American Ins. Co. v. Woodside Homes Corp.*, 448 F. Supp. 2d 1275, 2006 WL 2527425 (D. Utah, 2006) (an insured's own faulty or negligent work is not characterized as an occurrence under a commercial general liability policy); *H.E. Davis & Sons, Inc. v. North Pacific Ins. Co.*, 248 F.Supp.2d 1079, 1084 (D. Utah, 2002) (accident is something which is not a natural or intended consequence and not the result of negligence) . . . .

*Id.*

Referring to *N.M. ex rel. Caleb v. Daniel E.*, the *Bartile* panel observed that "[t]he Utah Supreme Court recently clarified that 'harm or damage is not accidental if it is the natural and probable consequence of the insured's act or should have been expected by the insured,'" and that "Utah law focuses on the unexpectedness of the result or injury."  618 F.3d at 1174 (quoting *N.M. ex rel. Caleb v. Daniel E.*, 175 P.3d at 569).  *Bartile* also noted the Utah court's rejection of foreseeability as the measure of the accidental nature of an "occurrence":

> Although the Utah Supreme Court indicated that "the test is not whether the result was foreseeable, but whether it was expected," *N.M. ex rel. Caleb*, 175 P.3d at 571 (internal quotation marks omitted), the court was concerned that importing the meaning of "foreseeability" from tort law would "render[ ] coverage completely illusory," *id.* at 571 n. 7.  But Wyoming has not imported the definition of "foreseeable" from tort law and, like Utah, uses the concept of "expected" in its definition of "accident."

*Id.* at 1174 n.16.  Yet the *Bartile* panel rejected the insured's argument that *H.E. Davis & Sons, Inc.*'s reliance on foreseeability of damage in defining an "occurrence" is inconsistent with *N.M. ex rel. Caleb v. Daniel E.*'s rejection of foreseeability as a measure:

> Because *H.E. Davis* used the term "foreseeable" in finding that the negligent action was not an "accident," Bartile claims that *H.E. Davis* was effectively overruled by *N.M. ex rel. Caleb*. . . .  [H]owever, the Utah Supreme Court was concerned with importing the meaning of "foreseeability" from tort law.  *N.M. ex rel. Caleb*, 175 P.3d at 571 n. 7.  Furthermore, *H.E. Davis* is consistent with *N.M. ex rel. Caleb* because it found that the negligent results of the construction were not "expected."  *H.E. Davis*, 248 F. Supp. 2d at 1084.  The district court also did not err in omitting *N.M. ex rel. Caleb* from its discussion in this case because the Utah Supreme Court followed its own precedent in defining the term "accident" for purposes of a CGL policy.

*Id.* at 1175 n.18.  This explanation proves unclear at best.  To say that the damage resulting from negligent construction was not "expected" suggests that it was accidental, yet *H.E. Davis & Sons* reached the contrary conclusion because such damage was "foreseeable," and therefore "natural." 248 F. Supp. 2d at 1084.  Thereafter, the Utah court again explicitly rejected foreseeability as the

-36-

applicable standard in *N.M. ex rel. Caleb v. Daniel E.* .

Prior Tenth Circuit authority had acknowledged that "Utah has adopted a broad definition of accident" in insurance policies, and that "[t]he Utah court also has noted that in a liability policy, 'courts have generally held that 'accident' includes results negligently caused by the insured.'"  *Allstate Insurance Co. v. Worthington*, 46 F.3d 1005, 1011 (10th Cir. 1995) (quoting *Hoffman*, 669 P.2d at 416 n.2).[49]  Of course, counsel had alerted the *Worthington* panel to the existence of the *Hoffman* case.

Not so in *H.E. Davis & Sons*, where counsel for both the insurer and the insured failed even to cite to *Hoffman* in their summary judgment memoranda, with the insurer relying instead upon *Nova Casualty* and its discussion of negligent misrepresentation as intentional conduct.[50]

The opinions that subsequently rely upon *H.E. Davis & Sons* as an accurate statement of Utah law do so without examining its underpinnings in the Utah case law.  In *Linford*, the most

---

[49]In *Worthington*, the Tenth Circuit, applying Utah law, found coverage where a man took hostages at a hospital and fatally wounded a nurse.  The man's ex-wife was sued for negligently entrusting weapons to him and failing to warn the victims.  *Worthington* reasoned that the allegations against her involved injury that may have resulted from an "accident" under the policy's terms, even if her ex-husband's violent acts were themselves intentional.

[50]Counsel for the insurers in *H.E. Davis & Sons* asserted that "*Nova* is analogous to the case at bar.  Davis compacted the soil at the Site, knowing that adequate site preparation was necessary for the timely completion of the project.  Davis failed to adequately compact the soil, with natural and foreseeable results."  (Memorandum in Support of Defendants' Motion for Summary Judgment, filed February 1, 2002 (CM/ECF No. 9), in *H.E. Davis & Sons, Inc. v. North Pacific Insurance Co.*, Civil No. 2:01-CV-0139S (D. Utah), at 7.  Counsel further asserted that "*Nova* makes no distinction as to whether the inadequacy of the Site preparation was negligent or intentional"—likely so because *Nova Casualty* dealt with claims of intentional and negligent misrepresentation, both purposeful acts—and that "[s]ince Davis prepared the Site with the intent of compacting the soil pad adequately, then any result of this work – even an unsatisfactory result – must be considered expected or intended under *Nova*"—a dubious proposition at best, and one that short-circuits the analysis prescribed in *Hoffman*.  (*Id.*)

recent example, counsel for the parties again did not call the court's attention to the *Hoffman* opinion—or even to the Utah Supreme Court's explicit rejection of the foreseeability standard in *N.M. ex rel. Caleb v. Daniel E.*—which was cited by insurer's counsel for the proposition that "when determining what constitutes an 'accident,' Utah courts look at the 'natural and probable consequence' of an act."[51]  Instead, counsel equated the foreseeable consequences of the insured's negligence with the "natural" consequences of an act.

In this case, AMSCO has refused to concede the argumentative ground claimed by Cincinnati in the name of *H.E. Davis & Sons* and *Linford*, turning instead to the opinions of the Utah Supreme Court in *Hoffman* and *N.M. ex rel. Caleb v. Daniel E.*—authoritative opinions that govern this diversity action on questions of Utah law.  *See Wade*, 483 F.3d at 665-66 ("The federal court must follow the most recent decisions of the state's highest court."); *Grain Dealers Mut. Ins. Co. v. Lower*, 979 F.2d 1411, 1416 (10th Cir. 1992) ("'we must apply the most recent

---

[51](The Cincinnati Insurance Company's Opposition to Arrowood Indemnity Company's Motion for Summary Judgment and Memorandum in Support of the Cincinnati Insurance Company's Motion for Summary Judgment, filed October 15, 2009 (CM/ECF No. 58), in *Cincinnati Ins. Co. v. Linford Bros. Glass Co.*, No. 2:08-CV-387-TC (D. Utah), at 44.) According to insurer's counsel in *Linford*,

> Utah law clearly indicates that an insured's own faulty work is not characterized by the courts as an accident or "occurrence."  *See*, *H.E. Davis & Sons, Inc. v. North Pacific Insurance Company*, 248 F. Supp. 2d 1079 (D. Utah 2002) ("So long as the consequences of plaintiff's work are natural, expected or intended, they cannot be considered an "accident"); *Great American Insur. Co. v. Woodside Homes Corp.*, 448 F. Supp. 2d 1275, 1281 (D. Utah 2006) ("Utah case law indicates that an insured's own faulty work is not fairly characterized as an occurrence under a commercial general liability policy.")

(*Id.*)  Even opposing insurance counsel in *Linford* conceded that under *H.E. Davis & Sons*, the insured would be denied coverage for lack of an "occurrence."  From the *Linford* docket, it appears that the insured itself did not actively participate in the summary judgment process.

statement of state law by the state's highest court'" (quoting *Southwest Forest Indus., Inc. v. Sutton*, 868 F.2d 352, 354 (10th Cir. 1989), *cert. denied*, 494 U.S. 1017 (1990))).

> Where no controlling state decision exists, the federal court must attempt to predict what the state's highest court would do.  In performing this ventriloquial function, however, the federal court is bound by ordinary principles of stare decisis.  Thus, when a panel of this Court has rendered a decision interpreting state law, that interpretation is binding on district courts in this circuit, and on subsequent panels of this Court, unless an intervening decision of the state's highest court has resolved the issue. . . .

*Wankier v. Crown Equipment Corp.*, 353 F.3d 862, 866 (10th Cir. 2003) (citing *Blackhawk-Central City Sanitation Dist. v. Am. Guar.*, 214 F.3d 1183, 1194 n. 4 (10th Cir. 2000), and *Koch v. Koch Indus., Inc.*, 203 F.3d 1202, 1231 (10th Cir. 2000)).

Yet the same is not true of prior district court opinions.  While principles of *stare decisis* bind panels of the court of appeals to follow the "law of the circuit" embodied in prior opinions of that court,

> "it is clear that there is no such thing as 'the law of the district.'"  *Threadgill v. Armstrong World Indus., Inc.*, 928 F.2d 1366, 1371 (3d Cir. 1991). "[D]istrict court decisions cannot be treated as authoritative on issues of law. The reasoning of district judges is of course entitled to respect, but the decision of a district judge cannot be a controlling precedent."  *Bank of Am., N.A. v. Moglia*, 330 F.3d 942, 949 (7th Cir. 2003) (quotation omitted).

*Garcia v. Tyson Foods, Inc.*, 534 F.3d 1320, 1329 (10th Cir. 2008).  "Even where the facts of a prior district court case are, for all practical purposes, the same as those presented to a different district court in the same district, the prior 'resolution of those claims does not bar reconsideration'" by another district judge "'of similar contentions. The doctrine of *stare decisis* does not compel one district court judge to follow the decision of another.'" *Threadgill v. Armstrong World Indus., Inc.*, 928 F.2d at 1371 (footnote omitted) (quoting *State Farm Mut. Auto. Ins. Co. v. Bates*, 542 F.Supp. 807, 816 (N.D. Ga. 1982)).  "Where a second judge believes

that a different result may obtain, independent analysis is appropriate." *Id.*[52]  As the Eleventh

Circuit explained in *Fishman & Tobin, Inc. v. Tropical Shipping & Const. Co., Ltd.*, 240 F.3d

956 (11th Cir. 2001),

> Unlike circuit court panels where one panel will not overrule another, . . . district
> courts are not held to the same standard. . . .  While the decisions of their fellow
> judges are persuasive, they are not binding authority. . . .  As a result, the district
> court cannot be said to be bound by a decision of one of its brother or sister
> judges.

*Id.* at 965 (citations omitted). The Supreme Court acknowledged this distinction in *Gasperini v.*

*Center for Humanities, Inc.*, 518 U.S. 415 (1996): "If there is a federal district court standard, it

must come from the Court of Appeals, not from the over 40 district court judges in the Southern

District of New York, each of whom sits alone and renders decisions not binding on the others,"

*id.* at 430 n.10, and more recently in *Camreta v. Greene*, 131 S.Ct. 2020 (2011): "'A decision of

 a federal district court judge is not binding precedent in either a different judicial district, the

---

[52]*See also Gould v. Bowyer*, 11 F.3d 82, 84 (7th Cir. 1993) ("A district court decision
binds no judge in any other case, save to the extent that doctrines of preclusion (not *stare decisis*)
apply."); *United States v. Articles of Drug Consisting of 203 Paper Bags*, 818 F.2d 569,
(7th Cir. 1987) ("A single district court decision . . .  has little precedential effect. It is not
binding on the circuit, or even on other district judges in the same district."); *Colby v. J.C.
Penney Co., Inc.*, 811 F.2d 1119, 1124 (7th Cir. 1987) (district judges should not treat decisions
of other district judges as controlling unless doctrines of res judicata or collateral estoppel apply);
*Starbuck v. City and Cnty of San Francisco*, 556 F.2d 450, 457 n.13 (9th Cir. 1977) ("The
doctrine of stare decisis does not compel one district court judge to follow the decision of
another."); *Hart v. Massanari*, 266 F.3d 1155, 1174 (9th Cir. 2001) (observing that the first
district judge to decide an issue within a district or within a circuit does not bind all similarly
situated district judges);  *Farley v. Farley*, 481 F.2d 1009 (3d Cir. 1973) (noting that even a
three-judge decision of the district court is not necessarily binding on any other district court);
*Pears v. Mobile Cnty*, 645 F. Supp. 2d 1062, 1076 n.18 (S.D. Ala. 2009) ("It is black-letter law
that the decision of one federal district court is not binding on another federal district court, or
even on the same judge in another case." (citations omitted)); *EEOC v. Pan American World
Airways*, 576 F.Supp. 1530, 1535 (S.D.N.Y.1984) (district court decision was not binding even
on other district courts in the same district).

same judicial district, or even upon the same judge in a different case.'" *Id.* at 2033 n.7 (quoting 18 James Wm. Moore, *Moore's Fed. Practice* § 134.02[1][d], at p. 134-26 (3d ed. rev. 2011) (footnote omitted)).

Thus, as AMSCO suggests, in addressing the Utah law of accidental "occurrence," this court is not bound to follow the prior opinions of other judges of this District in *H.E. Davis & Sons*, *Woodside Homes*, or even *Cincinnati Ins. Co. v. Linford*.

### AMSCO's Theory of Coverage

AMSCO submits that Under Utah law, "the analysis of whether there has been an occurrence under a CGL policy of insurance turns on what an insured intends or expects, and not on what the insured foresees,"[53] and "[u]nder the Utah definition of accident, allegations of consequential or resultant damages attributable to an insured's negligence, but which are unexpected or unintended by an insured, are similarly sufficient to trigger potential coverage under the CGL Policies."[54]  In this case, "none of the Homeowner Claims implicated by Cincinnati's declaratory judgment action contain any allegations that AMSCO intended or expected the alleged damages to flow from its design and manufacture of its windows.  Indeed, the allegations reveal that the alleged defects in AMSCO's windows caused unexpected resultant damages to other property."[55]  In each instance, AMSCO submits, the Nevada Homeowner Claims allege that defects in the installation of AMSCO's windows or in the windows themselves resulted in more than property damage to the AMSCO windows; the alleged defects

---

[53](AMSCO Mem. at 6.)

[54](*Id.* at 8.)

[55](*Id.* at 13.)

resulted in "[w]ater damage to the carpet, padding, floors, walls, and ceilings of the residences, . .

. [w]ater damage to the drywall and carpeting, . . . [w]ater marks at the soffit, corbels, sills and

walls throughout the house, caused by leaking. . . . [m]oisture infiltration into the underlying

building, framing, and wall assembly components" and "[r]esultant deterioration of the stucco

surrounding the windows," among other property damage.[56]   AMSCO argues that at a minimum,

the "Resultant Damages" are the unintended and unexpected result of an "occurrence" within the

meaning of Cincinatti's CGL policy language, and that such allegations trigger Cincinnati's duty

to defend AMSCO under the terms of those policies.[57]

Cincinnati acknowledges that "all of the claims can be reduced to an allegation that

AMSCO purportedly manufactured windows in a defective manner which caused damage to

other property,"[58] but argues that "[t]he claims for defective windows and doors and resulting

damages due to water intrusion are claims which are the natural and probable consequence of any

design and/or manufacturing defect in those windows,"[59] and thus cannot be covered as the result

of an accidental "occurrence" under the terms of Cincinnati's policies.

---

[56](*Id.* at 13-14.)

[57](*See* AMSCO Windows' Memorandum in Opposition to the Cincinnati's Insurance Company's Motion for Summary Judgment, filed November 10, 2011 (CM/ECF No. 54) ("AMSCO Opp. Mem."), at iii.)

[58](Cincinnati Mem. at 20.)

[59](The Cincinnati Insurance Company's Reply Memorandum in Support of its Cross-motion for Summary Judgment Against AMSCO Windows, filed November 28, 2011 (CM/ECF No. 56), at 29.)

**"Resultant Damage" as an "Occurrence"**

A well-known insurance law treatise explains that

> a claim for faulty workmanship, in and of itself, is not an occurrence under a commercial general liability policy because a failure of workmanship does not involve the fortuity required to constitute an accident.  Instead, what does constitute an occurrence is an accident caused by or resulting from faulty workmanship, including damage to any property other than the work product and damage to the work product other than the defective workmanship.  In other words, although a commercial general liability policy does not provide coverage for faulty workmanship that damages only the resulting work product, the policy does provide coverage if the faulty workmanship causes bodily injury or property damage to something other than the insured's work product.

9A Lee Russ & Thomas F. Segalla, *Couch on Insurance* § 129:4, at pp. 129-13 to 129-14 (3d ed. 2005) (footnotes omitted).

While courts are far from unanimous in their reading of "occurrence" in CGL policies, a significant number of State courts recognize the distinction between defective workmanship and damage to other property resulting from the defective workmanship.  In *General Security Ind. Co. v. Mt. States Mut. Cas.*, 205 P.3d 529 (Colo. Ct. App. 2009), the Colorado Court of Appeals concluded that "the better rule is that a claim for damages arising from poor workmanship, standing alone, does not allege an accident that constitutes a covered occurrence, regardless of the underlying legal theory pled."  205 P.3d at 534.  In doing so, it adopted the majority view:

> There is a split among other jurisdictions whether a defective workmanship claim, standing alone, is an "occurrence" under CGL policies.   See 9A *Couch on Insurance* § 129:4 (collecting cases). . . .
>
>     A majority of those jurisdictions has held that claims of poor workmanship, standing alone, are not occurrences that trigger coverage under CGL policies similar to those at issue here. . . .

*Id.* at 534-35 (citations omitted).   "Further," the Colorado court observed, "a corollary to the majority rule is that an 'accident' and 'occurrence' are present when consequential property

damage has been inflicted upon a third party as a result of the insured's activity. . . ." *Id.* at 535

(citations omitted).

> We are persuaded by the majority rule because it . . . relies on the
> necessary element of fortuity inherent in the ordinary meaning of the term
> "accident."  Additionally, the Tenth Circuit and Colorado courts have found an
> "occurrence" only when additional, consequential property damages were alleged
> as a result of the faulty workmanship.  *Adair Group, Inc. v. St. Paul Fire &
> Marine Ins. Co.*, 477 F.3d 1186, 1187–88 (10th Cir. 2007); *see, e.g.*, *Am.
> Employer's Ins. Co. v. Pinkard Constr. Co.*, 806 P.2d 954, 955 (Colo. App. 1990)
> (coverage when the poor workmanship in using the wrong material for a roof
> installation led to the roof collapsing, which caused additional property damage);
> *Colard v. Am. Family Mut. Ins. Co.*, 709 P.2d 11, 13 (Colo. App. 1985) (coverage
> when the poor workmanship created an exposure to continuous condition, which
> resulted in additional property damage).

*Id.*[60]  As to the majority rule,[61] the Colorado court cited cases such as *Kvaerner Metals Div. of*

*Kvaerner U.S., Inc. v. Commercial Union Ins. Co.*, 589 Pa. 317, 908 A.2d 888 (2006), in which

the Supreme Court of Pennsylvania adopted the majority rule, holding

> that the definition of "accident" required to establish an "occurrence" under the
> policies cannot be satisfied by claims based upon faulty workmanship.  Such
> claims simply do not present the degree of fortuity contemplated by the ordinary
> definition of "accident" or its common judicial construction in this context.  To
> hold otherwise would be to convert a policy for insurance into a performance
> bond.  We are unwilling to do so, especially since such protections are already
> readily available for the protection of contractors.

---

[60]In response to *General Security*, the Colorado Legislature enacted Colo. Rev. Stat.
§ 13–20–808.  "Explicitly critiquing the restrictive interpretation of 'accident' adopted by the
*General Security* court, § 13-20-808 provides that 'in interpreting a liability insurance policy
issued to a construction professional, a court shall presume that the work of a construction
professional that results in property damage, including damage to the work itself or other work, is
an accident.'"  *United Fire & Cas. Co. v. Boulder Plaza Residential, LLC*, 633 F.3d 951 (10th
Cir. 2011).

[61]*See, e.g.*, *Cincinnati Ins. Co. v. Motorists Mut. Ins. Co.*, 306 S.W.3d 69, 73 (Ky. 2010)
("The majority viewpoint, however, appears to be that claims of faulty workmanship, standing
alone, are not 'occurrences' under CGL policies.").

908 A.2d at 899 (footnotes omitted).  In doing so, the Pennsylvania court noted that

> The application and limitations of CGL policies were aptly explained in a seminal law review article by Roger C. Henderson[:]
>
>> *The risk intended to be insured is the possibility that the goods, products or work of the insured, once relinquished and completed, will cause bodily injury or damage to property other than to the completed work itself and for which the insured [may] be found liable.*  The insured, as a source of goods or services, may be liable as a matter of contract law to make good on products or work which is defective or otherwise unsuitable because it is lacking in some capacity.  This may even extend to an obligation to completely replace or rebuild the deficient work or product.  This liability, however, is not what the coverages in question are designed to protect against.  The coverage is for tort liability for physical damages to others and not for contractual liability of the insured for economic loss because the product or completed work is not that for which the damaged person bargained.

*Id.* at 899 n.10 (quoting Roger Henderson, *Insurance Protection for Products Liability and Completed Operations; What Every Lawyer Should Know*, 50 Neb. L. Rev. 415, 441 (1971) (emphasis added)).  *Kvaerner* concluded that "[t]he underlying suit in this case avers only property damage from poor workmanship to the work product itself. . . .  As faulty workmanship does not constitute an ''accident'' as required to set forth an occurrence under the CGL policies, we hold that National Union had no duty to defend or indemnify Kvaerner in the action brought by Bethlehem."  *Id.* at 900.

The *Kvaerner* court in turn relied on *L–J, Inc. v. Bituminous Fire and Marine Ins. Co.*, 366 S.C. 117, 621 S.E.2d 33 (2005), in which the South Carolina Supreme Court ruled that faulty road construction workmanship resulting in the deterioration of the roads "is not something that is typically caused by an accident or by exposure to the same general harmful conditions, we hold that the damage in this case did not constitute an occurrence" under the policies.  366 S.C. at 123,

621 S.E.2d at 36 (footnote omitted).  The *L-J* court noted that "[t]he CGL policy may, however, provide coverage in cases where faulty workmanship causes a third party bodily injury or damage to other property, *not in cases where faulty workmanship damages the work product alone*."  *Id.* at n.4 (emphasis in original).  The *L-J* court explained:

> We find the analysis used by the New Hampshire Supreme Court helpful in distinguishing between a claim for faulty workmanship versus a claim for damage to the work product caused by the negligence of a third party.  *High Country Assocs. v. New Hampshire Ins. Co.*, 139 N.H. 39, 648 A.2d 474 (1994). In *High Country Assocs.*, the court held that a CGL provided coverage for property damage caused by continuous exposure to moisture when the complaint alleged negligent construction that resulted in property damage and not merely negligent construction damaging only the work product itself.  *Id.* at 477.  The complaint in *High Country Assocs.* alleged:
>
> > [a]ctual damage to the buildings caused by exposure to water seeping into the walls that resulted from the negligent construction methods of High Country Associates.  The damages claimed are for the water-damaged walls, not the diminution in value or cost of repairing work of inferior quality. Therefore, the property damage described in the amended writ, caused by continuous exposure to moisture through leaky walls, is not simply a claim for the contractor's defective work.

366 S.C. at 123-24, 621 S.E.2d at 36.  "Therefore," the *High Country Assocs.* court had concluded,

> the property damage described in the amended writ, caused by continuous exposure to moisture through leaky walls, is not simply a claim for the contractor's defective work.  Instead, the plaintiff in the underlying suit alleged negligent construction that resulted in property damage, rather than merely negligent construction . . . .
> . . . .
> The amended writ alleges actual damage to the structure of the condominium units by continuing exposure to moisture due to deficiencies in the construction of the units.  Therefore, the Association alleged negligent construction that resulted in an occurrence, rather than an occurrence of alleged negligent construction.

139 N.H. at 43, 45, 648 A.2d at 477, 478.  The court in *High Country Assocs.* distinguished two

prior New Hampshire cases, *McAllister v. Peerless Insurance Co.*, 124 N.H. 676, 474 A.2d 1033 (1984), and *Hull v. Berkshire Mutual Insurance Co.*, 121 N.H. 230, 427 A.2d 523 (1981), because in those cases "the damage claimed was only defective workmanship," and "'defective work, standing alone, did not result from an occurrence.'" *Id.*

Other courts dealing with similar claims for resultant damage to property other than the defective workmanship have reached similar conclusions. *See, e.g.*, *ACUITY v. Burd & Smith Const., Inc.*, 2006 ND 187, 721 N.W.2d 33 (N.D. 2006) (ruling that property damage caused by an insured's faulty workmanship was a covered occurrence under a CGL insurance policy to the extent the faulty workmanship caused bodily injury or property damage to property other than the insured's work product); *Westfield Ins. Co. v. Sheehan Const. Co., Inc.*, 580 F. Supp. 2d 701 (S.D. Ind. 2008) (explaining that under Indiana law, risk that the goods, products or work of the insured will cause damage to property other than to the product or completed work itself is covered by CGL insurance policies, and serves to limit contractors' tort liability for damage to property caused by their work); *CMK Development Corp. v. West Bend Mut. Ins. Co.*, 395 Ill. App. 3d 830, 335 Ill. Dec. 91, 917 N.E.2d 1155 (1st Dist. 2009) (noting that defective workmanship in a construction project can be covered under a CGL policy if it damaged something other than the project work product itself); *Travelers Indem. Co. of America v. Moore & Associates, Inc.*, 216 S.W.3d 302, 308 (Tenn. 2007) (ruling that alleged water penetration from faulty window installation by named insured's subcontractor was "accident" and, thus, "occurrence" within the meaning of CGL policy); *Crossmann Cmtys. of North Carolina, Inc. v. Harleysville Mut. Ins. Co.*, 395 S.C. 40, ——, 717 S.E.2d 589, 594 (2011) (holding that the definition of "occurrence" in CGL policies is ambiguous and must therefore be construed in

favor of the insured, but also clarifying "that negligent or defective construction resulting in

damage to otherwise non-defective components may constitute 'property damage,' but the

defective construction would not"); *Town & Country Property, L.L.C. v. Amerisure Ins. Co.*, ___

So. 3d ___, 2011 WL 5009777, at *5 (Ala. 2011) (observing that "we may conclude that faulty

workmanship itself is not an occurrence but that faulty workmanship may lead to an occurrence if

it subjects personal property or other parts of the structure to 'continuous or repeated exposure'

to some other 'general harmful condition . . . and, as a result of that exposure, personal property

or other parts of the structure are damaged."); *cf. Cincinnati Ins. Co. v. Motorists Mut. Ins. Co.*,

306 S.W.3d 69, 80 n.45 (Ky. 2010) (noting that "[i]t appears as if a general rule exists whereby a

CGL policy would apply if the faulty workmanship caused bodily injury or property damage to

something other than the insured's allegedly faulty work product" (citing 9A *Couch on Insurance*

§ 129:4 (3d ed. 2009))).

In *Greystone Const., Inc. v. National Fire & Marine Ins. Co.*, 661 F.3d 1272 (10th Cir.

2011), the court of appeals observed that

> most federal circuit and state supreme court cases line up in favor of finding an
> occurrence in the circumstances we consider here.  In fact, a strong recent trend in
> the case law interprets the term "occurrence" to encompass unanticipated damage
> to nondefective property resulting from poor workmanship. . . .  These cases
> generally hold that damage caused by faulty workmanship is neither expected nor
> intended from the standpoint of the policyholders and, therefore, receives
> coverage so long as it does not fall under a policy exclusion.  As the Texas
> Supreme Court explained, "a deliberate act, performed negligently, is an accident
> if the effect is not the intended or expected result; that is, the result would have
> been different had the deliberate act been performed correctly."  *Lamar Homes*,
> 242 S.W.3d at 8.

661 F.3d at 1282-83 (citations omitted) (applying Colorado law).[62]  After examining *General*

*Security* and other Colorado cases, the court of appeals concluded that

> an unanticipated or unforeseeable injury to person or property—even in the
> absence of true fortuity—may be an accident and, therefore, a covered occurrence.
> *See Hoang*, 129 P.3d at 1034 ("[I]t is the knowledge and intent of the insured that
> make injuries . . . expected or intended rather than accidental."); *see also The
> Oxford English Dictionary* 74 (2d Ed. 1989) (defining accident as "[a]nything that
> happens without foresight or expectation"); *Black's Law Dictionary* 15 (7th
> ed.1999) (noting that "[t]he word 'accident,' in accident policies, means an event
> which takes place without one's foresight or expectation").  This formulation
> aligns with the CGL policies' definition of an "accident," which includes
> "continuous or repeated exposure to substantially the same harmful conditions."
> R. at 147.  Thus, if the physical damage was unforeseeable and resulted from poor
> workmanship (which in this case was exacerbated by the continuous exposure to
> harmful conditions), then the exposure would constitute an accident, and therefore
> an occurrence, even though it did not necessarily occur by chance.

*Id.* at 1285.  "In assessing whether damage caused by poor workmanship was foreseeable," the

*Greystone* panel reasoned,

> we ask whether damages would have been foreseeable *if the builder and his
> subcontractors had completed the work properly*.  Any other approach renders the
> doctrine illogical.  This is because, by definition, only damage caused by
> purposeful neglect or knowingly poor workmanship is foreseeable; a correctly
> installed shingle does not ordinarily fall, and a correctly installed window does not

---

[62]*Greystone* cites *Am. Empire Surplus Lines Ins. Co. v. Hathaway Dev. Co.*, 288 Ga. 749,
707 S.E.2d 369, 371 (2011) (acknowledging a "trend in a growing number of jurisdictions" to
cover damage resulting from poor workmanship); *Sheehan Constr. Co. v. Cont'l Cas. Co.*, 935
N.E.2d 160 (Ind. 2010); *Architex Ass'n, Inc. v. Scottsdale Ins. Co.*, 27 So.3d 1148 (Miss. 2010);
*Trinity Homes LLC v. Ohio Cas. Ins. Co.*, 629 F.3d 653 (7th Cir. 2010); *Auto Owners Ins. Co. v.
Newman*, 385 S.C. 187, 684 S.E.2d 541 (2009), *clarified by Crossmann Communities of N.C.,
Inc. v. Harleysville Mut. Ins.* Co., 395 S.C. 40, 717 S.E.2d 589, 592–93 (2011); *U.S. Fire Ins.
Co. v. J.S.U.B., Inc.*, 979 So.2d 871 (Fla. 2007); *Lamar Homes, Inc. v. Mid–Continent Cas. Co.*,
242 S.W.3d 1 (Tex. 2007); *French v. Assurance Co. of Am.*, 448 F.3d 693 (4th Cir. 2006); *Lee
Builders, Inc. v. Farm Bureau Mut. Ins. Co.*, 281 Kan. 844, 137 P.3d 486 (2006); *Am. Family
Mut. Ins. Co. v. Am. Girl, Inc.*, 268 Wis.2d 16, 673 N.W.2d 65 (2004); *Fejes v. Alaska Ins. Co.*,
984 P.2d 519 (Alaska 1999), as well as *Great Am. Ins. Co. v. Woodside Homes Corp.*, 448
F.Supp.2d 1275 (D. Utah 2006), discussed *supra*.
.

ordinarily leak. . . .  CGL policies are meant to cover unforeseeable damages—a category that encompasses faulty workmanship that leads to physical damage of nondefective property.

*Id.* at 1285-86 (emphasis added).[63]  The court concluded that "faulty workmanship, standing alone, is not caused by an accident—but that damage to other property caused by the faulty workmanship (including both the nondefective work product of the contractor and third-party property) is the result of an accident," and thus results from an "occurrence" within CGL policy coverage; "the property damage alleged here," *viz.*, movement of the basement floor and damage to upper living areas, allegedly resulting from house's continuous exposure to expansive soils due to poor design and construction of house's soil-drainage and structural elements, "may result from an occurrence triggering a duty to defend the policyholder."  *Id.* at 1287, 1289.

In this case, Cincinnati's summary judgment memoranda acknowledge none of this.

Instead, Cincinnati argues that "AMSCO's alleged negligence does not constitute an accident or an occurrence," and that "Utah law is in conformity with cases from other jurisdictions holding that faulty workmanship does not constitute an 'occurrence' under CGL policies," citing the *General Security* and *Kvaerner* cases discussed above.[64]  Cincinnati makes no reference to *General Security*'s "corollary to the majority rule" that "an 'accident' and 'occurrence' are present when consequential property damage has been inflicted," or that "the

---

[63]*Greystone* noted that in *Adair Group, Inc. v. St. Paul Fire & Marine Insurance Co.*, 477 F.3d 1186, 1188 (10th Cir. 2007), "we held that deficient performance by a subcontractor was not in itself an event triggering application of a CGL policy. The appellant sought 'indemnity for the construction deficiencies alone, not for any consequent or resultant damages flowing from the poor workmanship.'  *Id.*  Because the appellants in this case allege consequential damages (to nondefective portions of the property) flowing from the poor workmanship of a subcontractor, *Adair* is not applicable here." *Id.* at 1285 n.10.

[64](Cincinnati Mem. at 21.)

Tenth Circuit and Colorado courts have found an "occurrence" when "additional, consequential property damages were alleged as a result of the faulty workmanship."  205 P.3d at 535.  Nor does Cincinnati point out the *Kvaerner* court's observation that "'the risk intended to be insured is the possibility that the goods, products or work of the insured . . . will cause bodily injury or *damage to property other than to the completed work itself and for which the insured [may] be found liable*.'"  908 A.2d at 899 n.10.

### Resultant Damage and "Occurrence" Under Utah Law

Of the Utah and federal cases referenced by the parties, only *Linford* directly addresses whether damage to other property caused by defective workmanship results from a covered "occurrence," but it does so summarily, with no substantive analysis of the issue beyond its reference to *Woodside Homes*.  *Woodside Homes* in turn relies on *H.E. Davis & Sons* for the general proposition that "the consequences of negligent work are reasonably foreseeable and therefore no 'accident' resulting from that work can occur."  448 F. Supp. 2d at 1280 ("*H.E. Davis* directly answers the question of whether an insured's negligent work can be considered an accident under a commercial general liability policy").  *Linford* makes no reference to *N.M. ex rel. Caleb v. Daniel E.*, and does not attempt to reconcile the Utah Supreme Court's rejection of foreseeability analysis with *H.E. Davis & Sons*, in which the "occurrence" issue was decided in terms of *foreseeability*.

In the *Bartile* case, the court of appeals recognized that in *N.M. ex rel. Caleb v. Daniel E.*, the Utah Supreme Court "was concerned that importing the meaning of 'foreseeability' from tort law would 'render[ ] coverage completely illusory'"; that under Utah law "'the test is not whether the result was foreseeable, but whether it was expected'"; *Bartile* states that "'Utah law focuses

on the unexpectedness of the result or injury,'" and "uses the concept of 'expected' in its

definition of 'accident.'"  618 F.3d at 1174 & n.16 (quoting *N.M. ex rel. Caleb v. Daniel E.*, 175

P.3d at 569, 571 n.7).[65]  *Bartile* affirmed the district court's application of Wyoming law, and

observed that "[u]nder Wyoming and Utah law, 'the natural results of [an insured's] negligent

and unworkmanlike construction do not constitute an occurrence triggering coverage under a

[CGL] policy.'" *Id.* (quoting *Great Divide Ins.*, 2006 WL 3933078, at *8).  But in *Bartile*, the

claims all arose out of construction defects caused by "Bartile's allegedly negligent roofing

work," without reference to any damage to any nondefective property.  Thus, *Bartile* did not

---

[65]According to Cincinnati, the court of appeals "noted that any difference between the 'natural and probative consequence' used by the Utah Supreme Court in *Caleb* and the "reasonably foreseeable" analysis used in the *Linford* Action were immaterial," (Cincinnati Opp. Mem. at 83), but this assertion finds no direct support in the *Bartile* opinion.

*Bartile* cites *H.E. Davis & Sons* as "holding that the insured's negligent work was not an 'accident' under Utah law because the consequences of such work were 'natural, expected, or intended,'" and concludes that "*H.E. Davis* is consistent with *N.M. ex rel. Caleb* because it found that the negligent results of the construction were not 'expected.'" *Id.* at 1175 & n.18.  Perhaps the *Bartile* panel meant to say that the results of negligence "were expected"—omitting the "not" —but either way, *H.E. Davis & Sons* equated "natural" results with "foreseeable" results:

> regardless of plaintiff's negligence or the ultimate poor quality of its work,
> plaintiff could *foresee* the natural consequences of its actions.  Defendant claims
> these natural consequences include the removal and replacement of the soil pad
> and the concrete footings poured by Gramoll Construction.  The court agrees.
> Plaintiff failed to adequately compact the soil, with natural and foreseeable
> results.

248 F. Supp. 2d at 1084 (emphasis in original).  Reconciling *H.E. Davis & Sons*' foreseeability analysis with *N.M. ex rel. Caleb v. Daniel E.*'s explicit rejection of foreseeability as the standard defining an accidental "occurrence" proves to be problematic at best.

Even if foreseeability was the standard under Utah law, the court of appeals' in *Greystone* adopted an approach to damage caused by poor workmanship contrary to that of *H.E. Davis & Sons* and *Linford*: "we ask whether damages would have been foreseeable if the builder and his subcontractors *had completed the work properly*.  Any other approach renders the doctrine illogical."  661 F.3d at 1285-86 (applying Colorado law) (emphasis added).

squarely address the question presented here, namely whether damage to other property resulted

from a covered "occurrence," as AMSCO insists.[66]

> " In determining state law" in this diversity action,
>
> the decisions of the state's highest court are accorded the greatest weight. . . .
> Whatever its grounds, a decision of a state's highest court must be accepted by
> federal courts as authoritative on state law unless it can be said with some
> assurance that the state's highest court itself will not follow the decision in the
> future.

8 Fed. Proc. L. Ed. *Courts and Judicial System* § 20:623, at 660 (2005) (footnotes omitted).

Where the Utah Supreme Court has not squarely addressed the particular question now before

this court, this court must predict  how Utah's " highest court would rule." *FDIC v.*

*Schuchmann*, 235 F.3d 1217, 1225 (10th Cir. 2000); *see also Wood v. Eli Lilly & Co.*, 38 F.3d

510, 512 (10th Cir. 1994) (explaining that the objective is to ascertain and apply state law so that

the result obtained is the result that would be reached in the state court; "we must in essence sit

as a state court and predict how the highest state court would rule").

Having examined the Utah Supreme Court opinions discussing "accident" and

"occurrence," and in particular the *Hoffman* and  *N.M. ex rel. Caleb v. Daniel E.* cases, this court

is persuaded that the Utah Supreme Court, if presented with the question, would hold that where

defective workmanship causes damage to property other than the work product itself, that such

---

[66]*Bartile* thus does not govern the outcome in this case because (1) it decided a question
of Wyoming law, not Utah law, and (2) it did not address the problem of resultant damages to
property other than the defective work product itself.

   If this court adopts *General Security*'s  "majority rule" as a prediction of Utah law—as
Cincinnati now urges—then the court of appeals' *Greystone* opinion instructs that  "faulty
workmanship, standing alone, is not caused by an accident—but that damage to other property
caused by the faulty workmanship (including both the nondefective work product of the
contractor and third-party property) is the result of an accident," and thus results from an
"occurrence" within CGL policy coverage.  661 F.3d at 1287 (applying Colorado law).

damage results from an accidental "occurrence" within the meaning of CGL policy language.

The negligence-based foreseeability analysis of *H.E. Davis & Sons*, extended without further analysis to the "resultant damage" issue by *Linford*, simply cannot be reconciled with the Utah Supreme Court's admonition that "[w]e have clearly held that 'the test is not whether the result was foreseeable, but whether it was expected,'" *N.M. ex rel. Caleb v. Daniel E.*, 2008 UT 1, at ¶ 11, 175 P.3d at 571 (quoting *Hoffman*, 669 P.2d at 416).

The Utah court has acknowledged that in the "area of liability insurance, courts have generally held that 'accident' includes results negligently caused by the insured," *Hoffman*, 669 P.2d at 416 n.2, and it has itself ruled that the term encompasses an insured's negligent conduct.[67] Its determination that "the common meaning of the term [accident] is defined in terms of whether the event was naturally and probably expected or anticipated by the insured," and that "it is that definition which must be applied, and not one founded on foreseeability," *id.* at 416, supports this court's conclusion,[68] as does the Utah court's expressed concern that "[i]f foreseeability were the measure of what constitutes an accident," then insurers "would never have a duty to

_____

[67]Indeed, "[t]he 'unexpected event' standard laid down in *Richards* as to what constitutes an accident includes not only death resulting from conduct of the insured which is negligent, but also death resulting from an insured's conduct which is reckless." *Hoffman*, 669 P.2d at 417 (footnote omitted); *cf. Green v. State Farm Fire & Cas. Co.*, 2005 UT App 564, ¶ 34, 127 P.3d 1279, 1285 (by alleging intentional and negligent misrepresentations, "Fennell's complaint did not include allegations that constitute an occurrence under the Policy.  The Fennell complaint does not include a claim for simple negligence and therefore is not germane to State Farm's duty to defend or to our analysis.").

[68]As explained above, the court of appeals in *Bartile* grasped that in Utah, "'the test is not whether the result was foreseeable, but whether it was expected,' *N.M. ex rel. Caleb*, 175 P.3d at 571," and that Utah law "uses the concept of 'expected' in its definition of 'accident,'" and " focuses on the unexpectedness of the *result or injury*." 618 F.3d at 1174 & n.16 (emphasis in original).  Our court of appeals thus comprehends that Utah law has not "imported the meaning of 'foreseeability' from tort law" in defining what constitutes an "occurrence." *Id.*

indemnify policy holders, rendering coverage completely illusory" because if "an injury is foreseeable, the insurer could avoid the duty to indemnify by asserting that the injury was not an accident"[69]—which was precisely what happened in *H.E. Davis & Sons* and *Linford*.[70]

### Certification of a Question

AMSCO "requested certification in the event that this Court found that the tension between settled Utah law, as articulated by the Utah Supreme Court in *Caleb* and *Hoffman*, and recent interpretations of Utah law, as articulated in the decisions of the federal district court in *Linford*, *Woodside Homes*, and *H.E. Davis*, rendered the resolution of the state law issue unusually difficult enough to warrant certification."  (AMSCO Opp. Mem. at 2-3.)

In this diversity case, there really can be no meaningful tension between the opinions of the Utah Supreme Court and prior opinions of this court because (1) the Utah Supreme Court speaks authoritatively on questions of Utah law and when it does speak, this court (and our court of appeals) gives deference to what it says; and (2) prior opinions of other federal district judges such as *H.E. Davis* and *Linford* have no binding *stare decisis* effect on *this* court in *this* case. The Utah cases discussing "occurrence," particularly *Hoffman* and more recently *N.M. ex rel. Caleb v. Daniel E.*, provide helpful guidance in predicting that the Utah Supreme Court would conclude that an "occurrence" within the meaning of Cincinnati's policy language includes "an

---

[69]  *N.M. ex rel. Caleb v. Daniel E.*, 2008 UT 1, at ¶ 11 n.7, 175 P.3d at 571 n.7.

[70]As noted above, insurance counsel in *H.E. Davis & Sons* did not call the *Hoffman* opinion to the court's attention, arguing instead that "Utah case law and cases from other jurisdictions . . . generally define an 'accident' as something which is . . .  not the result of negligence," 248 F. Supp. 2d at 1084—directly contrary to the clear import of the *Hoffman* opinion.  *N.M. ex rel. Caleb v. Daniel E.* amplifies *Hoffman*'s rejection of foreseeability analysis in defining an "occurrence."

-55-

accident caused by or resulting from faulty workmanship, including damage to any property other than the work product,"[71] such as the "resultant damage" alleged against AMSCO in the Nevada litigation.

This conclusion is further buttressed by our court of appeals' recent opinion in *Greystone* explaining that "a strong recent trend in the case law interprets the term 'occurrence' to encompass unanticipated damage to nondefective property resulting from poor workmanship." 661 F.3d at 1282.[72]  These cases "generally hold that damage caused by faulty workmanship is neither expected nor intended from the standpoint of the policyholders and, therefore, receives coverage so long as it does not fall under a policy exclusion."  *Id.* at 1283.  As the court of appeals noted in *Bartile*, Utah law "uses the concept of 'expected' in its definition of 'accident,'" and  "that 'the test is not whether the result was foreseeable, but whether it was expected.'" 618 F.3d at 1174 n.16 (quoting *N.M. ex rel. Caleb v. Daniel E.*, 175 P.3d at 571).  Given this consistency as to expected or intended results, the Utah court would likely follow the trend identified in *Greystone* and reach the same conclusion about the resultant damage in this case.

Thus, at this point, there appears to be no need to certify a question to the Utah court on this issue.

### Cincinnati's Coverage Exclusions

In its Complaint, Cincinnati raised several exclusions for coverage as applying to the

---

[71]9A Lee Russ & Thomas F. Segalla, *Couch on Insurance* § 129:4, at p. 129-14 (3d ed. 2005).

[72]Even the case law cited by Cincinnati recognizes that an "occurrence" may be found where "consequential property damage has been inflicted upon a third party as a result of the insured's activity."  *General Security*, 205 P.3d at 535.

claims alleged against AMSCO, each of which Cincinnati asserted would relieve it of any duty to defend AMSCO as to those claims.  AMSCO moved for summary judgment as to those exclusions form coverage as well as the "occurrence" issue.  While Cincinnati vigorously opposed AMSCO on the "occurrence" issue and filed its own cross-motion for summary judgment on that question, it did not submit any argument opposing summary judgment as to the exclusions from coverage, apparently conceding the issue.[73]

AMSCO should thus be granted summary judgment as to the effect of those exclusions in this case.

### Cross-Motions re: Arrowood's Counterclaim

As summarized above, Arrowood filed a counterclaim against Cincinnati seeking a declaratory judgment that Cincinnati owes Arrowood "a duty of equitable contribution or indemnity for defense costs and/or fees paid by ARROWOOD on behalf of AMSCO" as a result of the same Nevada claims and lawsuits.[74]  Arrowood moved for summary judgment on that counterclaim, and Cincinnati filed a cross-motion for summary judgment against Arrowood on the same issue.[75]  Both insurers filed memoranda supporting and opposing their respective

---

[73](*See* AMSCO Opp. Mem. at 1 ("Cincinnati no longer argues that any of the myriad exclusions invoked in its Complaint apply."): Cincinnati Reply, *passim* (no reference to coverage exclusions).)

[74](Answer of Arrowood Indemnity Company to the Cincinnati's Insurance Company's Complaint and Counterclaim for Declaratory Relief, filed July 14, 2010 (CM/ECF No. 6), at 14 ¶ 7.)

[75](*See* Defendant and Counterclaimant Arrowood Indemnity Company's Motion for Summary Judgment and Joinder in AMSCO's Motion for Summary Judgment or in the Alternative to Certify a Legal Question to the Utah Supreme Court, filed July 7, 2011 (CM/ECF No. 29); The Cincinnati Insurance Company's Cross-Motion for Summary Judgment on

(continued...)

-57-

motions.

Arrowood's memoranda offers little more than the bare assertion that it is entitled to indemnity and/or equitable contribution from Cincinnati for unidentified costs that Arrowood has incurred in its defense of AMSCO in the Nevada litigation. For its part, Cincinnati argues that Arrowood's counterclaim is barred by collateral estoppel in light of the *Linford* litigation discussed above.

In this Circuit, "[c]ollateral estoppel bars relitigation of a specific issue only when certain conditions are met:"

> (1) The issue precluded is identical to an issue actually litigated and necessarily adjudicated in the prior proceeding; (2) The party against whom estoppel was sought was a party to or was in privity with a party to the prior proceeding; (3) There was a final judgment on the merits in the prior proceeding; (4) The party against whom the doctrine is asserted had a full and fair opportunity to litigate the issues in the prior proceeding.

*Northern Arapaho Tribe v. Harnsberger*, 697 F.3d 1272, 1285 (10th Cir. 2012) (quoting *Nichols v. Bd. of Cnty. Comm'rs*, 506 F.3d 962, 967 (10th Cir. 2007)). "Collateral estoppel, otherwise known as issue preclusion, prevents parties or their privies from relitigating *facts and issues* in the second suit that were fully litigated in the first suit." *Moss v. Parr Waddoups Brown Gee & Loveless*, 2012 UT 42, ¶ 23, 285 P.3d 1157, 1164 (emphasis in original) (quoting *Jensen ex rel. Jensen v. Cunningham*, 2011 UT 17, ¶ 41, 250 P.3d 465, 476-77 (quoting *Oman v. Davis Sch. Dist.*, 2008 UT 70, ¶ 31, 194 P.3d 956, 965 (quoting *Snyder v. Murray City Corp.*, 2003 UT 13, ¶

---

[75](...continued)
Arrowood Indemnity Company's Counterclaims, filed October 11, 2011 (CM/ECF No. 46).)

35, 73 P.3d 325, 332)))).[76]

In this case, Cincinnati's assertion of collateral estoppel fails because the issue of Arrowood's entitlement to indemnity and/or equitable contribution from Cincinnati was raised in the *Linford* action, but was not "actually litigated and necessarily adjudicated in the prior proceeding," *Harnsberger*, 697 F.3d at 1285, or "completely, fully and fairly litigated" and "decided in the prior adjudication," *Jensen*, 2011 UT 17, at ¶ 41, 250 P.3d at 477, as issue preclusion requires.   In *Linford*, as explained above, Judge Campbell decided that under Utah law, the property damage alleged against the insured was not the result of an "occurrence" and was thus not covered by Cincinnati's policy.  That ruling disposed of the merits of that case, and the court never reached the question whether Cincinnati owed a duty of indemnity or equitable contribution to Arrowood because neither insurer had a duty to defend the insured in that case. Any opinion as to indemnity or equitable contribution would have been purely advisory, and not a proper subject for declaratory relief.  *See, e.g.*, *Rio Grande Silvery Minnow v. Bureau of Reclamation*, 601 F.3d 1096, 1109-10 (10th Cir. 2010) (noting that "[i]t is well established that what makes a declaratory judgment action a proper judicial resolution of a case or controversy

---

[76]Utah law likewise recognizes that "[i]ssue preclusion applies only when the following four elements are satisfied:"

> (i) the party against whom issue preclusion is asserted [was] a party to or in privity with a party to the prior adjudication; (ii) the issue decided in the prior adjudication [was] identical to the one presented in the instant action; (iii) the issue in the first action [was] completely, fully, and fairly litigated; and (iv) the first suit . . . resulted in a final judgment on the merits.

*Jensen ex rel. Jensen v. Cunningham*, 2011 UT 17, at ¶ 41, 250 P.3d at 477 (quoting *Oman*, 2008 UT 70, at ¶ 29, 194 P.3d at 965 (quoting *Collins v. Sandy City Bd. of Adjustment*, 2002 UT 77, ¶ 12, 52 P.3d 1267, 1270 (internal quotation marks omitted))

rather than an advisory opinion is the settling of some dispute which affects the behavior of the defendant toward the plaintiff" (internal quotation marks omitted)).  Where neither Cincinnati nor Arrowood was held to have a duty to defend Linford, any ruling as to indemnity or contribution between insurers in that context would have had no real-world effect on those parties.[77]

Apart from the failure of Cincinnati's collateral estoppel argument, this court is not persuaded that based upon the materials submitted to this court, Arrowood has met its initial Rule 56 burden to demonstrate its entitlement to summary judgment as a matter of law on its counterclaim.  For one thing, Arrowood's abbreviated statement of material facts[78] does not specifically identify any claims against AMSCO as to which Arrowood and Cincinnati provided concurrent liability coverage and are actually or potentially "liable for the same loss."  *Workers Compensation Fund v. Utah Business Ins. Co.*, 2013 UT 4, ¶ 19, ___ P.3d ____, 2013 WL 285684 (decided Jan. 25, 2013).

> ¶ 19  "The doctrine of 'equitable contribution' permits an insurer [that] has paid a claim[ ] to seek contribution directly from other insurers who are liable for the same loss." *Cas. Indem. Exch. Ins. Co. v. Liberty Nat'l Fire Ins. Co.*, 902 F.Supp. 1235, 1237 (D. Mont. 1995).  The doctrine of equitable contribution governs disputes in Utah between co-insurers who are liable for a common obligation.  *Sharon Steel Corp. v. Aetna Cas. & Sur. Co.*, 931 P.2d 127, 137–38 (Utah 1997).

---

[77] "'The crucial question is whether granting a *present* determination of the issues offered will have some effect in the real world.'"  *Wyoming v. U.S. Dep't of Agric.*, 414 F.3d 1207, 1212 (10th Cir. 2005) (emphasis added) (quoting *Citizens for Responsible Gov't State Political Action Comm. v. Davidson*, 236 F.3d 1174, 1182 (10th Cir .2000)).

[78] (*See* Defendant and Counterclaimant Arrowood Indemnity Company's Memorandum in Support of its Motion for Summary Judgment and Joinder in AMSCO Windows' Memorandum in Support of its Motion for Summary Judgment, filed July 7, 2011 (CM/ECF No. 29-1), at 2-3.)

¶ 20 We noted in *Sharon Steel* that equitable contribution is buttressed by two policy considerations.  First, it prevents the "inequitable result" of forcing one insurer to bear more than its share of losses.  *Id.* at 138.  Second, equitable contribution furthers this court's "policy of encouraging [insurers to make] prompt payments to the insured, leaving disputes concerning coverage to be determined later."  *Id.*  Insurance companies who know they can sue co-insurers for contribution will be more likely to pay claims promptly, as WCF did here.

*Id.* at ¶¶ 19-20, ___ P.3d at ___, 2013 WL 285684, at *4.

Arrowood may yet be able to establish its claim for equitable contribution or indemnity from Cincinnati, but to this point, it has not done so.  To that extent, its motion for summary judgment shall be denied.

Cincinnati's cross-motion for summary judgment likewise fails because of Cincinnati's near-total reliance upon its collateral estoppel theory and its failure to meet its initial Rule 56 burden to establish the absence of a genuine issue as to an absence of concurrent coverage of the same claimed loss.[79]

For the reasons explained in some detail above,

**IT IS ORDERED** that AMSCO's Motion for Summary Judgment or in the Alternative to Certify a Legal Question to the Utah Supreme Court, filed June 14, 2011 (CM/ECF No. 24), to the extent explained above, is hereby GRANTED IN PART and DENIED IN PART;

**IT IS FURTHER ORDERED** that Defendant and Counterclaimant Arrowood Indemnity Company's Motion for Summary Judgment and Joinder in AMSCO's Motion for Summary Judgment or in the Alternative to Certify a Legal Question to the Utah Supreme Court,

---

[79](*See* The Cincinnati Insurance Company's Memorandum in Support of its Cross-Motion for Summary Judgment on Arrowood Indemnity Company's Counterclaims and in Opposition to Arrowood Indemnity Company's Joinder and Motion for Summary Judgment or in the Alternative to Certify a Legal Question to the Utah Supreme Court, filed October 11, 2011 (CM/ECF No. 47), *passim*.)

filed July 7, 2011 (CM/ECF No. 29), is hereby GRANTED IN PART and DENIED IN PART for the same reasons and to the same extent as AMSCO's motion, and is DENIED as to Arrowood's counterclaim;

**IT IS FURTHER ORDERED** that The Cincinnati Insurance Company's Motion for Summary Judgment Against AMSCO Windows, filed October 11, 2011 (CM/ECF No. 48), is DENIED; and

**IT IS FURTHER ORDERED** that The Cincinnati Insurance Company's Cross-Motion for Summary Judgment on Arrowood Indemnity Company's Counterclaims, filed October 11, 2011 (CM/ECF No. 46), is hereby DENIED.

DATED this 5th day of February, 2013.

BY THE COURT:

BRUCE S. JENKINS
United States Senior District Judge